IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2013 Term

_____

No. 13-0086

_____

FILED

June 4, 2013

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA EX REL.
DISCOVER FINANCIAL SERVICES, INC.,
DISCOVER BANK, DFS SERVICES, L.L.C., AND
AMERICAN BANKERS MANAGEMENT COMPANY, INC.;
BANK OF AMERICA CORPORATION AND
FIA CARD SERVICES, N.A.;
CITIGROUP INC. AND CITIBANK, N.A.;
GE MONEY BANK;
WORLD FINANCIAL NETWORK NATIONAL BANK,
CSI PROCESSING, L.L.C., AND CPP NORTH AMERICA L.L.C.;
HSBC BANK NEVADA, N.A. AND HSBC CARD SERVICES, INC.;
AND JPMORGAN CHASE & CO. AND
CHASE BANK USA, N.A.,
Petitioners

V.

HONORABLE DAVID W. NIBERT, JUDGE OF
THE CIRCUIT COURT OF MASON COUNTY, WEST VIRGINIA,
Respondent

_____

Petition for a Writ of Prohibition

WRIT DENIED

_____

AND

_____

No. 13-0102
_____


STATE OF WEST VIRGINIA EX REL. GLAXOSMITHKLINE, LLC,
FORMERLY SMITHKLINE BEECHAM CORPORATION
D/B/A GLAXOSMITHKLINE,
Petitioner


V.


THE HONORABLE JAMES H. YOUNG, JR.,
JUDGE OF THE CIRCUIT COURT OF WAYNE COUNTY;
AND ALL PLAINTIFFS IN STATE EX REL.
MORRISEY V. GLAXOSMITHKLINE, LLC,
Respondents

_____


Petition for a Writ of Prohibition

WRIT DENIED

_____


Submitted:  May 14, 2013
Filed: June 4, 2013


| | |
|---|---|
| Kara Cunningham | Patrick Morrisey |
| Russell D. Jessee | Attorney General |
| Steptoe & Johnson, PLLC | Daniel W. Greear |
| Charleston, West Virginia | Chief Counsel |
| Attorneys for Petitioners, | Office of Attorney General |
| Discover Financial Services, Inc., | Charleston, West Virginia |
| Discover Bank, and | Attorneys for Respondent |
| DFS Services L.L.C. | in Case Number 13-0086 |
| | |
| Bruce M. Jacobs | Guy R. Bucci |
| Charles L. Woody | Timothy Bailey |
| Spilman Thomas & Battle, PLLC | L. Lee Javins, II |

Charleston, West Virginia
Attorneys for Petitioner,
American Bankers Management
Company, Inc.

Bruce M. Jacobs
Alexander Macia
Spilman Thomas & Battle, PLLC
Charleston, West Virginia
Attorneys for Petitioners,
Bank of America Corporation and
FIA Card Services, N.A.

Jeffrey M. Wakefield
Flaherty, Sensabaugh & Bonasso, PLLC
Charleston, West Virginia
Attorney for Petitioners,
Citigroup Inc. and Citibank, N.A.

Bryant J. Spann
David B. Thomas
Thomas Combs & Spann, PLLC
Charleston, West Virginia
Attorneys for Petitioner,
GE Money Bank

Charles M. Love
Fazal A. Shere
Bowles Rice McDavid Graff & Love, LLP
Charleston, West Virginia
and
Alan S. Kaplinsky
Martin C. Bryce, Jr.
Ballard Spahr, LLP
Philadelphia, Pennsylvania
Attorneys for Petitioner,
World Financial Network National Bank

Bruce M. Jacobs
Spilman, Thomas & Battle, PLLC
Charleston, West Virginia
Attorney for Petitioner,

Special Assistant Attorneys General
Bucci Bailey & Javins
Charleston, West Virginia
and
William Druckman
Special Assistant Attorney General
Druckman & Estep
Charleston, West Virginia
Attorneys for Respondent
in Case Number 13-0086

Patrick Morrisey
Attorney General
Daniel W. Greear
Chief Counsel
Office of Attorney General
Charleston, West Virginia
Attorneys for Respondents
in Case Number 13-0102

Paul T. Farrell, Jr.
Special Assistant Attorney General
Greene, Ketchum, Bailey, Walker,
Farrell & Tweel
Huntington, West Virginia
and
Laura J. Baughman
S. Ann Saucer
Special Assistant Attorneys General
Baron & Budd, PC
Dallas, Texas
and
Bill Robins
Justin R. Kaufman
Special Assistant Attorneys General
Heard Robins Cloud & Black, LLP
Santa Fe, New Mexico
Attorneys for Respondents
in Case Number 13-0102

**CCP North America L.L.C.**

**Chris R. Arthur**
**W. Scott Campbell**
**Samuel I. White, P.C.**
**Charleston, West Virginia**
**Attorneys for Petitioners,**
**HSBC Bank Nevada, N.A. and**
**HSBC Card Services, Inc.**

**William W. Booker**
**Thomas H. Ewing**
**Kay Casto & Chaney, PLLC**
**Charleston, West Virginia**
**Attorneys for Petitioners,**
**JPMorgan Chase & Co. and**
**Chase Bank USA, N.A.**

**Michael J. Farrell**
**Tamela J. White**
**Farrell, White & Legg, PLLC**
**Huntington, West Virginia**
**and**
**Kenneth H. Zucker**
**Nina M. Gussack**
**John F. Brenner**
**Ellen K. Scott**
**Pepper Hamilton, LLP**
**Philadelphia, Pennsylvania**
**Attorneys for Petitioner,**
**GlaxoSmithKline**

**Brenda Nichols Harper**
**West Virginia Chamber of Commerce**
**Charleston, West Virginia**
**and**
**Victor E. Schwartz**
**Cary Silverman**
**Shook, Hardy & Bacon, LLP**
**Washington, District of Columbia**
**and**
**Richard F. Shearer**

**Shook, Hardy & Bacon, LLP**
**Kansas City, Missouri**
**Attorneys for Amicus Curiae,**
**West Virginia Chamber of Commerce**


**JUSTICE DAVIS delivered the Opinion of the Court.**

**JUSTICE KETCHUM, deeming himself disqualified, did not participate in the decision of this case.**

**JUDGE FOX, sitting by temporary assignment.**

**SYLLABUS BY THE COURT**

1.     The phrase "contract of hire," in W. Va. Code § 6B-1-3(d) (2008) (Repl. Vol. 2010) of the West Virginia Governmental Ethics Act, refers to an agreement in which a person provides labor or personal services to a government entity for wages or a salary.

2.     Under the definition of "employee" provided by W. Va. Code § 6B-1-3(d) (2008) (Repl. Vol. 2010) of the West Virginia Governmental Ethics Act, a private attorney appointed as a special assistant attorney general is not an employee of the Office of the Attorney General.

3.     The Office of Attorney General retains inherent common law powers, when not expressly restricted or limited by statute.  The extent of those powers is to be determined on a case-by-case basis.  Insofar as the decision in *Manchin v. Browning*, 170 W. Va. 779, 296 S.E.2d 909 (1982), is inconsistent with this holding, it is expressly overruled.

4.     The Attorney General has common law authority to appoint special assistant attorneys general.

5.     The Attorney General has common law authority to provide for

compensation to be paid to special assistant attorneys general through a court-approved award of attorney's fees taken directly from the losing opponent in the litigation.

**Davis, Justice:**

This matter involves two consolidated petitions for writs of prohibition filed under the original jurisdiction of this Court. The petition filed in Case No. 13-0086 was brought by the defendants in seven consolidated cases pending before the Circuit Court of Mason County;[1] and the petition in Case No. 13-0102 was filed by GlaxoSmithKline, a defendant below, from a case pending before the Circuit Court of Wayne County.[2] The Petitioners seek a writ of prohibition to prevent enforcement of circuit court orders that denied their motions to disqualify private attorneys from representing the Respondent, the State of West Virginia,[3] as special assistant attorneys general. The essence of the Petitioners' contentions is that the special assistant attorneys general should be disqualified because their fee arrangements (1) violate the West Virginia Governmental Ethics Act; (2) violate Rule 1.7(b) of the West Virginia Rules of Professional Conduct;[4] and (3) the Attorney General

---

[1]The defendants in Case No. 13-0086 are: Discover Financial Services, Inc., Discover Bank, DFS Services, L.L.C., and American Bankers Management Company, Inc.; Bank of America Corporation and FIA Card Services, N.A.; Citigroup Inc. and Citibank, N.A.; GE Money Bank; World Financial Network National Bank, CSI Processing, L.L.C., and CPP North America L.L.C.; HSBC Bank Nevada, N.A. and HSBC Card Services, Inc.; and JPMorgan Chase & Co. and Chase Bank USA, N.A. These defendants filed a joint petition in this matter.

[2]Unless otherwise indicated, all of the defendants below will be referred to collectively as the "Petitioners."

[3]The Petitioners have labeled the trial judges as the Respondents in these matters. However, for purposes of this opinion, we will refer to the State as the Respondent, as it is the plaintiff below in each of these cases.

[4]Petitioner GlaxoSmithKline did not brief the Rule 1.7(b) issue. However, the
(continued...)

1

lacks authority to appoint special assistant attorneys general. After a careful review of the briefs and the record submitted in this case, and listening to the arguments of the parties, we deny the writs.[5]

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

The factual and procedural background for each of the consolidated cases will be set forth separately.

---

[4](...continued)
issue appears to have been raised in the circuit court.

[5]We wish to acknowledge the Amicus Curiae brief filed by the West Virginia Chamber of Commerce in support of the Petitioners in Case No. 13-0086. We also note that the Amicus brief raised several issues that were not raised by the parties. We decline to address the issues raised solely by the Amicus. *See Delardas v. County Court of Monongalia Cnty.*, 155 W. Va. 776, 783, 186 S.E.2d 847, 852 (1972) (finding it "possibly improper, for the Court to consider and to decide [an issue raised by amicus] in this case inasmuch as it has not been raised by any of the parties"). *See also People v. Archer*, 417 N.Y.S.2d 507, 513 (N.Y. App. Div. 1979) ("We would add that it is improper for the Amicus curiae herein to raise issues and cite alleged errors which were never raised or cited by appellant[.]"); *Homestake Mining Co. v. South Dakota Subsequent Injury Fund*, 644 N.W.2d 612, 621 (S.D. 2002) (holding that "it is improper for amicus to seek to widen the issues raised by the parties"); *East Sevier Cnty. Util. Dist. of Sevier Cnty. v. Wachovia Bank & Trust Co.*, 570 S.W.2d 850, 854 (Tenn. 1978) ("Numerous issues are raised in a brief filed amicus curiae . . ., but our discussion of those issues on the present record would be improper, since they were not dealt with in the trial court or properly developed in the proof.").

## A. Petitioners in Case No. 13-0086

The record in Case No. 13-0086 indicates that civil complaints were filed against each of the Petitioners by the Attorney General,[6] on behalf of the State, in August 2011.[7] The complaints alleged that the Petitioners violated the General Consumer Protection provisions of Article 6[8] of the West Virginia Consumer Credit and Protection Act[9] by engaging in unfair, deceptive, and unconscionable practices designed to trick consumers into paying for credit card service plans.

On April 20, 2012, the Petitioners filed a joint motion with the circuit court seeking to disqualify the special assistant attorneys general.[10] The motion alleged that the appointment of special assistant attorneys general violated the West Virginia Governmental Ethics Act and the Rules of Professional Conduct, and that the Attorney General did not have authority to make such appointments. A hearing on the motion was held on July 16, 2012.

---

[6]When the complaints were filed, the Attorney General was Darrell V. McGraw, Jr. The current duly-elected Attorney General is Attorney General Patrick Morrissey.

[7]As discussed *infra*, prior to the complaints being filed, the Attorney General appointed several private attorneys as special assistant attorneys general to act as lead counsel in each of the cases.

[8]*See* W. Va. Code § 46A-6-101 *et seq.*

[9]*See* W. Va. Code § 46A-1-101 *et seq.*

[10]Prior to filing the motion to disqualify, the Petitioners requested the cases be removed to federal court. The federal court ultimately remanded the cases back to state court.

On August 15, 2012, the trial court entered an order denying the motion to disqualify. The Petitioners subsequently filed the instant petition for a writ of prohibition.

### B. Petitioner in Case No. 13-0102

The record in Case No. 13-0102 indicates that a civil complaint was filed against the Petitioner, GlaxoSmithKline, by the Attorney General,[11] on behalf of the State, in March 2012.[12] The complaint alleged that the Petitioner violated the General Consumer Protection provisions of Article 6[13] of the West Virginia Consumer Credit and Protection Act[14] by engaging in unfair and deceptive acts and practices and by employing unfair methods of competition in marketing the diabetes drug Avandia. The complaint also alleged the Petitioner engaged in conduct that violated the West Virginia Fraud and Abuse in the Medicaid Program Act;[15] the West Virginia Public Employees Insurance Act;[16] and the West

---

[11]When the complaint was filed, the Attorney General was Darrell V. McGraw, Jr. *See supra* note 6.

[12]As discussed *infra*, prior to the complaint being filed, the Attorney General appointed several private attorneys as special assistant attorneys general to act as lead counsel in the case.

[13]*See* W. Va. Code § 46A-6-101 *et seq.*

[14]*See* W. Va. Code § 46A-1-101 *et seq.*

[15]*See* W. Va. Code § 9-7-1 *et seq.*

[16]*See* W. Va. Code § 5-16-1 *et seq.*

Virginia Insurance Fraud Prevention Act,[17] and set out other causes of action that included

strict liability, breach of warranty, and unjust enrichment.[18]

On August 10, 2012, the Petitioner filed a motion with the circuit court seeking

to disqualify the special assistant attorneys general. The motion alleged that the appointment

of special assistant attorneys general violated the West Virginia Governmental Ethics Act

and the Rules of Professional Conduct, and that the Attorney General did not have authority

to make such appointments.[19] On September 28, 2012, the trial court entered an order

denying the motion to disqualify. The Petitioner subsequently filed the instant petition for

a writ of prohibition.

## II.

### STANDARD OF REVIEW

This matter is before the Court on two consolidated petitions for writs of

prohibition that challenge lower court orders denying the Petitioners' motion to disqualify

the special assistant attorneys general. We have held that "[a] party aggrieved by a lower

court's decision on a motion to disqualify an attorney may properly challenge the lower

---

[17]*See* W. Va. Code § 33-41-1 *et seq*.

[18]The Governor requested the Attorney General bring some of the enumerated causes of action against the Petitioner.

[19]The Petitioner also alleged that State and Federal due process rights were violated by the fee arrangement made with the special assistant attorneys general.

court's decision by way of a petition for a writ of prohibition." Syl. pt. 1, *State ex rel. Bluestone Coal Corp. v. Mazzone*, 226 W. Va. 148, 697 S.E.2d 740 (2010). We also previously have held that "[a] writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court. It will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers. *W. Va. Code*, 53–1–1." Syl. pt. 2, *State ex rel. Peacher v. Sencindiver*, 160 W. Va. 314, 233 S.E.2d 425 (1977). More specifically, this Court has held:

> In determining whether to entertain and issue the writ of prohibition for cases not involving the absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syl. pt. 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996). Based upon these established standards, we proceed to consider the merits of the issues.

## III.

## DISCUSSION

As previously mentioned, the Petitioners seek to have this Court determine that the special assistant attorneys general should be disqualified because their fee arrangements violate the West Virginia Governmental Ethics Act and the Rules of Professional Conduct, and because the Attorney General lacks authority to appoint special assistant attorneys general.[20] We will address each issue separately.[21]

[20]We summarily reject Petitioner GlaxoSmithKline's contention that use of special assistant attorneys general violates its due process rights. The Petitioner has not cited to, nor have we found, *any* case that supports a due process violation claim through the use of special assistant attorneys general in the prosecution of civil cases. The two federal cases cited by Petitioner do not stand for such a proposition. The decision in *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 100 S. Ct. 1610, 64 L. Ed. 2d 182 (1980), cited by Petitioner, held that the federal Due Process Clause *was not* violated because of the enforcement of child labor laws by an assistant regional administrator. In the second federal case cited, *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 107 S. Ct. 2124, 95 L. Ed. 2d 740 (1987), the Court held that a trial court may appoint a private attorney to prosecute a litigant for criminal contempt, but that a court could not appoint counsel for one of the litigants in the underlying case as the prosecutor.

[21]The Respondent has urged this Court, as it did both circuit courts, to find that the Petitioners lack standing to litigate the disqualification issue. The Respondent argues that the Petitioners cannot show a resulting injury-in-fact from the representation provided by the special assistant attorneys general. We summarily reject the Respondent's contention. Our cases have indicated that a party may seek to disqualify an attorney even though no injury-in-fact would occur to the party seeking disqualification. *See State ex rel. Bluestone Coal Corp. v. Mazzone*, 226 W. Va. 148, 158, 697 S.E.2d 740, 750 (2010) ("[A] lawyer may be disqualified from participating in a pending case if his continued representation would give rise to an apparent conflict of interest or appearance of impropriety[.]"); *State ex rel. Blake v. Hatcher*, 218 W. Va. 407, 414, 624 S.E.2d 844, 851 (2005) ("While standing to raise a conflict of interest in a disqualification is generally vested with the client, an exception to this rule exists where the interests of the public are so greatly implicated that a third party should

(continued...)

7

### A. Application of the West Virginia Governmental Ethics Act

The Petitioners contend that the West Virginia Governmental Ethics Act (hereinafter the "Act")[22] applies to the special assistant attorneys general and that, as a result, the fee arrangements made with the special assistant attorneys general violate the Act.[23] The Respondent does not contest the fact that the Office of Attorney General and its employees are subject to the Act. The contentious issue presented by the Petitioners is whether the special assistant attorneys general are employees of the Office of Attorney General and, therefore, subject to the Act. This is an issue of first impression for this Court.

We begin by observing that we must apply our rules of statutory construction and determine whether the term "employee" under the Act includes special assistant attorneys general. Our rules of statutory construction are well established. "The primary

---

[21](...continued)
be entitled to raise the conflict." (internal quotations and citation omitted)); *Musick v. Musick*, 192 W. Va. 527, 530, 453 S.E.2d 361, 364 (1994) ("[T]his Court held that a circuit court judge . . . may disqualify a lawyer from representation in a case where that lawyer's representation may be in violation of the West Virginia Rules of Professional Conduct."); *State ex rel. Morgan Stanley & Co., Inc. v. MacQueen*, 187 W. Va. 97, 102, 416 S.E.2d 55, 60 (1992) ("[W]here the public interest is involved, an attorney may not represent conflicting interests even with the consent of all concerned. The rationale underlying this rule is . . . the ethical requirement that attorneys must avoid, as much as is possible, the appearance of impropriety." (internal quotations and citations omitted)).

[22]*See* W. Va. Code § 6B-1-1 (1989) (Repl. Vol. 2010) to W. Va. Code § 6B-3-11 (2005) (Repl. Vol. 2010).

[23]The terms of the fee arrangements are discussed further in this Section of the opinion, *infra*.

object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W. Va. 108, 219 S.E.2d 361 (1975). "A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." Syl. pt. 2, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951). In other words, "[w]here the language of a statutory provision is plain, its terms should be applied as written and not construed." *DeVane v. Kennedy*, 205 W. Va. 519, 529, 519 S.E.2d 622, 632 (1999) (citations omitted). "Only when such language is ambiguous may we interpret and construe a statutory provision." *Webster Cnty. Comm'n v. Clayton*, 206 W. Va. 107, 112, 522 S.E.2d 201, 206 (1999). Further, "[s]tatutes which relate to the same subject matter should be read and applied together so that the Legislature's intention can be gathered from the whole of the enactments." Syl. pt. 3, *Smith*, 159 W. Va. 108, 219 S.E.2d 361.

> The Legislature created the Act
>
> to define and establish minimum ethical standards for elected and appointed public officials and public employees; to eliminate actual conflicts of interest; to provide a means to define ethical standards; to provide a means of investigating and resolving ethical violations; and to provide administrative and criminal penalties for specific ethical violations herein found to be unlawful.

W. Va Code § 6B-1-2(b) (1989) (Repl. Vol. 2010). The Act establishes administrative civil

and criminal penalties[24] for public officials and employees who "exercise the powers of their office or employment for personal gain beyond the lawful emoluments of their position[.]" W. Va. Code § 6B-1-2(a). A twelve-member Ethics Commission is established under the Act. *See* W. Va. Code § 6B-2-1 (2008) (Repl. Vol. 2010). The Ethics Commission is empowered to "initiate or receive complaints and make investigations . . . of an alleged violation of [the Act] by a public official or public employee[.]" W. Va. Code § 6B-2-2(b) (2005) (Repl. Vol. 2010).[25] *See* W. Va. Code § 6B-2-4 (2008) (Repl. Vol. 2010) (processing complaints). The Act sets out ethical standards for public officials and employees under W. Va. Code § 6B-2-5 (2008) (Repl. Vol. 2010). The Act specifically provides that it applies "to all elected and appointed public officials and public employees, whether full or part time, in state, county, municipal governments and their respective boards, agencies, departments and commissions and in any other regional or local governmental agency, including county school boards." W. Va. Code § 6B-2-5(a). Critical to this case, the Act defines public "employee" as

> any person in the service of another under any *contract of hire*, whether express or implied, oral or written, where the employer or an agent of the employer or a public official has the right or power to control and direct such person in the material details of

---

[24]*See* W. Va. Code § 6B-2-10 (2005) (Repl. Vol. 2010) (violations and penalties).

[25]The Act created a Probable Cause Review Board to make an initial determination of "whether there is probable cause to believe that a violation of the West Virginia Governmental Ethics Act has occurred and, if so, to refer that investigation to the Ethics Commission." W. Va. Code § 6B-2-2a(a) (2008) (Repl. Vol. 2010).

10

how work is to be performed and who is not responsible for the making of policy nor for recommending official action.

W. Va. Code § 6B-1-3(d) (2008) (Repl. Vol. 2010) (emphasis added).

The Petitioners contend that under the definition of "employee," as set out in W. Va. Code § 6B-1-3(d), the special assistant attorneys general are employees of the Office of Attorney General. The Petitioners base this assertion on two grounds. First, the Petitioners contend that the letters appointing the attorneys, as special assistant attorneys general, were contracts of hire. Second, the Petitioners assert that the Attorney General exercised control over the work of the special assistant attorneys general.[26] Resolution of the first issue makes it unnecessary for us to address the second issue in the context raised.[27]

To begin, one of the requirements for being an employee under W. Va. Code § 6B-1-3(d) is the formation of a contract of hire. The statute does not define the phrase "contract of hire." We have held that "[i]n the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which

---

[26]The brief of Petitioner GlaxoSmithKline was far more general in this area than the specific issues raised by the brief of the other Petitioners. As such, we have incorporated the general arguments of Petitioner GalxoSmithKline into the more precise arguments of the other Petitioners.

[27]The second issue is addressed in a different context in Section III.B. of this opinion, *infra*.

11

they are used." Syl. pt. 1, *Miners in Gen. Grp. v. Hix*, 123 W. Va. 637, 17 S.E.2d 810

(1941), *overruled on other grounds by Lee–Norse Co. v. Rutledge*, 170 W. Va. 162, 291

S.E.2d 477 (1982). *See State v. Kenyon, Inc.*, 153 S.W.2d 195, 197 (Tex. Civ. App. 1941)

("Since the statute does not define the term 'contract of hire,' we are required to apply Sec.

24, O.S.1931, 25 Okla. St. Ann. § 1, which provides that 'words used in any statute are to be

understood in their ordinary sense, except when a contrary intention plainly appears.'").

Indeed, one court has suggested that "[t]he term 'contract of hire' is not defined in the act

probably because the legislature felt that the expression was so well established, understood

and definite, that it needs no further amplification or exposition. It is used in its common

meaning and acceptation." *Child v. Board of Review of Indus. Comm'n of State*, 332 P.2d

928, 931 (Utah 1958) (internal quotation and citation omitted).

> When confronted with a statute that did not define the phrase "contract of hire,"
>
> courts have uniformly held such a contract to mean one where the services to be performed by the employee must be compensated for in wages or their equivalent. It is impossible to have a contract of hire unless the person denominated the employer has an obligation to pay the person employed.

*Stapleton v. Administrator, Unemployment Comp. Act*, 112 A.2d 211, 213 (Conn. 1955)

(citations omitted). *See Child*, 332 P.2d at 931 (stating that "a contract of hire" "is an

agreement whereby one undertakes or obligates himself to render personal service for

another for a remuneration to be paid because the service was rendered" (internal quotations

and citation omitted)). In other words, "[a] 'contract [of] hire' is defined as any agreement

under which one person performs personal services at the request of another who pays for the services." *Adele's Housekeeping, Inc. v. Department of Emp't Sec.*, 757 P.2d 480, 483 (Utah Ct. App. 1988) (internal quotations and citation omitted). *See Daleiden v. Jefferson Cnty. Joint Sch. Dist.*, 80 P.3d 1067, 1070 (Idaho 2003) ("[A] 'contract of hire' is usually defined as an agreement in which an employee provides labor or personal services to an employer for wages or remuneration or other thing of value supplied by the employer."); *Deville v. Pugh*, 490 So. 2d 800, 802 (La. Ct. App. 1986) ("LSA-C.C. Art. 2669 defines a contract of hire as one 'by which one party gives to the other the enjoyment of . . . his labor, at a fixed price.'"); *Appeal of Jenks*, 965 A.2d 1073, 1076 (N.H. 2008) ("[I]n order to establish a contract [of] hire, the claimant must have received or expected to receive payment of some kind." (internal quotations and citation omitted)); *Gibbs v. Newport News Shipbuilding & Drydock Co.*, 733 S.E.2d 648, 654 (Va. 2012) ("A 'contract of hire' is usually defined as an agreement [written or implied] in which an employee provides labor or personal services to an employer for wages or remuneration or other thing of value supplied by the employer."). "Moreover, an employee's right to demand payment for his services from the employer would seem to be essential to his right to receive compensation." *Kirksey v. Assurance Tire Co.*, 428 S.E.2d 721, 723 (S.C. Ct. App. 1993) (internal quotations and citation omitted).

In view of the above authorities we now hold that the phrase "contract of hire," in W. Va. Code § 6B-1-3(d) (2008) (Repl. Vol. 2010) of the West Virginia Governmental

13

Ethics Act, refers to an agreement in which a person provides labor or personal services to a government entity for wages or a salary.[28]

Because of this commonly-accepted meaning of the phrase "contract of hire," it was incumbent upon the Petitioners to present evidence showing that the Attorney General agreed to pay the special assistant attorneys general remuneration for their services. The Petitioners failed to do so. In fact, the evidence shows the special assistant attorneys general may not receive *any* compensation for their legal services. The appointment letters sent to the special assistant attorneys general stated, in relevant part:

> It is contemplated that you will advance all expenses associated with the maintenance of this action. Subject to the approval of the court, it is anticipated that you should earn a proper, reasonable and customary fee.[29]

(Footnote added). The language from the appointment letters does not require the Attorney

---

[28]We wish to make clear that this definition alone does not make a person an employee under the Act. This is merely one factor that must be met.

[29]The appointment letter sent to the private attorneys in the case against GlaxoSmithKline was amended to read, in relevant part:

> It is contemplated that you will advance all expenses associated with the maintenance of this action. Subject to the approval of the court, it is contemplated that you should earn a proper, reasonable and customary fee to be paid by the Defendant. However, you will not receive any fee based upon any recovery by the State for harm to the State's Medicaid program that is subject to refund to the Centers for Medicare and Medicaid Services.

14

General to pay the special assistant attorneys general wages or anything of value. All that the letters provide is that the special assistant attorneys general must pay the cost of litigating the cases and that, *if they prevail*, a court *may* award them attorney's fees. The Mason County Circuit Court's order, in Case No. 13-0086, set out findings of fact that accurately described the issue of compensation to the special assistant attorneys general:

> The lawyers took the chance to spend their money to prosecute this action on behalf of West Virginia when they were not promised any hourly fee or the reimbursements of their expenses and costs. If they lost this case the West Virginia taxpayers would not have to pay any money–but the lawyers would have lost a substantial amount of money.

(Internal quotations and citation omitted). In the final analysis, "[i]t is impossible to have a contract of hire unless the person denominated the employer has an obligation to pay the person employed." *Stapleton*, 112 A.2d at 213.[30] No evidence was provided in this proceeding to establish this very fundamental requirement.

Consequently, we now hold that, under the definition of "employee" provided by W. Va. Code § 6B-1-3(d) (2008) (Repl. Vol. 2010) of the West Virginia Governmental Ethics Act, a private attorney appointed as a special assistant attorney general is not an employee of the Office of the Attorney General.

---

[30]"When services or labor are rendered voluntarily without a promise of compensation or remuneration of any kind, express or implied, then the one providing the services or labor has supplied them gratuitously[.]" *Charlottesville Music Ctr., Inc. v. McCray*, 205 S.E.2d 674, 678 (Va. 1974).

15

Our holding is consistent with other language found in the Act. For example, under W. Va. Code § 6B-2-5(*l*)(1) (2008) (Repl. Vol. 2010) of the Act, the Legislature has prohibited public employees from receiving certain compensation. This provision provides, in relevant part:

> (1) A public employee may not receive additional compensation from another publicly-funded state, county or municipal office or employment for working the same hours, unless:
>
> . . . .
>
> (C) The public employee uses earned paid vacation, personal or compensatory time or takes unpaid leave from his or her public employment to perform the duties of another public office or employment.

It is clear that, under the Act, W. Va. Code § 6B-2-5(*l*)(1), it is contemplated that an employee will accrue "paid vacation or compensatory time." Nothing in the record submitted in these cases shows that the special assistant attorneys general have the right to accrue vacation or compensatory time from the Office of the Attorney General. *See Williams v. Brown*, 190 W. Va. 202, 207, 437 S.E.2d 775, 780 (1993) ("[A]ssistant attorneys general receive certain employment-related benefits, such as health insurance and retirement, as do other state employees[.]"). No such evidence was presented because the special assistant attorneys general are not employees of the Attorney General.[31] *See Conant v. Robins,*

---

[31]Because we have determined that the special assistant attorneys general are not employees of the Attorney General, for purposes of the Act, we need not address Petitioners' argument that the fee arrangement made with the special assistant attorneys

(continued...)

16

*Kaplan, Miller & Ciresi, L.L.P.*, 603 N.W.2d 143, 145 (Minn. Ct. App. 1999) ("[T]he State of Minnesota retained the law firm of Robins, Kaplan, Miller Ciresi, L.L.P., and attorney Michael Ciresi to serve as special attorneys to represent the state in litigation against certain tobacco companies to recover damages arising from the sale and distribution of cigarettes. The special attorneys, although serving at the direction of the attorney general, were not considered state employees and were not eligible for state benefits[.]").

### B. Application of Rule 1.7 of the
### West Virginia Rules of Professional Conduct

The Petitioners in Case No. 13-0086 have argued that the "contingency" fee arrangement made with the special assistant attorneys general violates the conflict of interest provision of Rule 1.7(b) of the West Virginia Rules of Professional Conduct.[32] This issue requires that we examine the language of Rule 1.7(b). We have recognized that "court rules are interpreted using the same principles and canons of construction that govern the interpretation of statutes." *Casaccio v. Curtiss*, 228 W. Va. 156, ___, 718 S.E.2d 506, 511

---

[31](...continued)
general violated the Act. We also summarily reject the Petitioners' contention that the special assistant attorneys general could not prosecute the actions because W. Va. Code § 46A-7-102(1)(f) (1996) (Repl. Vol. 2006) only authorizes the Attorney General to "[d]elegate his powers and duties under this chapter to qualified personnel in his office[.]" In view of our discussion of the Attorney General's inherent common law powers *infra* at Section III.C., we find that the Attorney General had authority to appoint special assistant attorneys general to act as lead counsel in these cases: all of the complaints in these cases were signed by the Attorney General's Chief Deputy.

[32]Petitioner GlaxoSmithKline did not brief this issue.

(2011) (citations omitted). Further, we also have indicated that "where the language of a rule is clear and unambiguous, it should not be construed but applied according to its terms." Syl. pt. 3, in part, *State v. Mason*, 157 W. Va. 923, 205 S.E.2d 819 (1974).

> The language of Rule 1.7(b) provides:
>
> A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or *by the lawyer's own interests*, unless:
>
> (1) the lawyer reasonably believes the representation will not be adversely affected; and
>
> (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

(Emphasis added). Petitioners have isolated the third clause in Rule 1.7(b), "by the lawyer's own interests," as being violated. In other words, the Petitioners contend that the interests of the special assistant attorneys general in obtaining a fee will materially limit their responsibilities to their client, the State.

The Mason County Circuit Court found that Rule 1.7(b) was not applicable because, among other reasons, the rule only applies to an attorney representing two clients. In support of its position, the Mason County Circuit Court's order quoted and relied upon a subheading in the opinion of *In re James*, 223 W. Va. 870, 679 S.E.2d 702 (2009). Specifically, the circuit court's order quoted the following subheading from *James*: "**1. Rule**

18

**1.7 does not apply unless there are two actual clients.**" *James*, 223 W. Va. at 876, 679 S.E.2d at 708 (emphasis in original). We find that the Mason County Circuit Court misinterpreted *James*.

The decision in *James* was a lawyer disciplinary proceeding in which the Office of Disciplinary Counsel (hereinafter the "ODC") disagreed with the Hearing Panel Subcommittee's recommendation to dismiss charges against the lawyer in the case. ODC contended that the lawyer violated Rule 1.7 when he represented a client in a criminal matter arising from an automobile accident and provided advice and assistance to another person involving the same or a substantially related matter. The issue this Court addressed in *James* was whether Rule 1.7 was applicable to a situation in which an attorney represents an actual client and gives advice to a potential client. The opinion concluded that "Rule 1.7 of the Rules of Professional Conduct does not apply to this situation involving one actual client . . . and one potential client[.]" *James*, 223 W. Va. at 877, 679 S.E.2d at 709. It was this ruling that the subheading was intended to reflect.

To be clear, in spite of the subheading used in *James*, the decision did not hold that Rule 1.7 may be invoked only when a lawyer represents two clients. The subheading was descriptive of the specific issue addressed in that particular case and was not a dispositive ruling on the entire coverage of Rule 1.7. Rule 1.7(b) actually addresses three

19

situations.[33]  The rule addresses the issue of a lawyer's conflict of interest involving his or her client and (1) another client, (2) a third person, or (3) the lawyer's own interests. *See State ex rel. Verizon West Virginia, Inc. v. Matish*, ___ W. Va. ___, ___, 740 S.E.2d 84, 92 (2013) ("Pursuant to the express language of West Virginia Rule of Professional Conduct 1.7(b), a lawyer is prohibited from representing a client if such representation may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests." (internal quotations and citation omitted)).  The decision in *Committee on Legal Ethics of The West Virginia State Bar v. Cometti*, 189 W. Va. 262, 430 S.E.2d 320 (1993), illustrates the application of the third prohibition in Rule 1.7(b).

In *Cometti*, a lawyer was charged with violating Rule 1.7(b) when he filed suit against his former client in order to retrieve property that belonged to him but that was in the possession of the former client.  No other client was involved in the case; therefore the only provision in Rule 1.7(b) that was applicable was the "lawyer's own interests" provision.  This Court found that the lawyer did not violate this provision, by placing his own interests above

---

[33]Rule 1.7(a) is limited to a lawyer's representation of two clients:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client;  and

(2) each client consents after consultation.

his client's interests, because he no longer represented the client:

> Mr. Cometti contends that he had been discharged from his representation of Ms. Shrewsbury at the time he filed the civil action. Although the facts surrounding Mr. Cometti's withdrawal as Ms. Shrewsbury's attorney in the heating system case are convoluted, it is clear that both parties had engaged in, at the least, very heated discussions concerning his withdrawal. We are persuaded that Mr. Cometti had withdrawn at the time he filed suit by the testimony of L. Alvin Hunt, a lawyer sought out by Ms. Shrewsbury to take over her heating system case. Mr. Hunt testified to the Committee that several days prior to the institution of Mr. Cometti's suit against Ms. Shrewsbury, she sought his services and told him that Mr. Cometti was no longer her attorney. Because Mr. Cometti no longer represented Ms. Shrewsbury at the time he instituted the suit to gain access to the property to obtain his possessions, we find that Mr. Cometti did not violate Rule 1.7(b).

*Cometti*, 189 W. Va. at 268, 430 S.E.2d at 326.

Thus it is clear that, in the instant case, the Mason County Circuit Court erred in finding that Rule 1.7(b) could be invoked only when a lawyer has a conflict of interest that involves two clients. While we reject the circuit court's finding on this narrow ground, we agree with the ultimate decision of the circuit court that Rule 1.7(b) was not violated by the fee arrangement of the special assistant attorneys general.

**1. Viewing the litigation as quasi-criminal.** The Petitioners argue that this Court should view the case as a criminal proceeding because of the statutory civil penalties that may be imposed if liability is found.[34] Further, the Petitioners contend that, insofar as courts prohibit criminal prosecuting attorneys from having a financial interest in the outcome of criminal cases, this Court should prohibit the appointment of the special assistant attorneys general because they have a financial interest in the outcome of the litigation. *See State v. Culbreath*, 30 S.W.3d 309, 314 (Tenn. 2000) ("Numerous courts and commentators have recognized, however, that the use of a private attorney in the prosecution of a criminal case may present ethical dilemmas, including conflicts of interest.").

The Petitioners' brief cites to several cases in which courts have noted in dicta that statutory causes of action imposing civil penalties may be viewed as quasi-criminal in nature. *See, e.g.*, *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 355, 118 S. Ct. 1279, 1288, 140 L. Ed. 2d 438 (1998) ("Moreover, the awarding of civil penalties to the Government could be viewed as analogous to sentencing in a criminal proceeding."); *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 971-72 (2d Cir. 1985) ("The Ex Post Facto Clause . . . may also be applied in civil cases where the civil disabilities disguise criminal penalties."); *First Am. Bank of Virginia v. Dole*, 763 F.2d 644, 651 n.6 (4th Cir. 1985) ("Civil penalties may be considered 'quasi-criminal' in nature."); *United States v.*

---

[34]Petitioner GlaxoSmithKline also argued that the litigation should be viewed as quasi-criminal in general, but not in the context of Rule 1.7(b).

*Sanchez*, 520 F. Supp. 1038, 1040 (S.D. Fla. 1981) ("At the outset, the Court would note that

while technically these cases are civil actions, the imposition of a fine as a penalty for

violation of the law can be considered 'quasi-criminal' in nature."). In further support of

their argument, the Petitioners contend that the special assistant attorneys general will

recommend that the Attorney General pursue penalties based on their own financial interests.

Assuming, for the sake of argument, that this Court treated this case as "quasi-

criminal" in nature because of the civil penalties,[35] Petitioners have failed to demonstrate

---

[35]This Court has recognized the following test for determining whether a monetary penalty should be treated as a criminal or civil penalty:

> The question of whether a particular statutorily defined penalty is civil or criminal is a matter of statutory construction, and requires the application of a two-level inquiry. . . . First, courts must determine whether the legislature indicated, either expressly or impliedly, a preference for labeling the statute civil or criminal. Second, if the legislature indicates an intention to establish a civil remedy, courts must consider whether the legislature, irrespective of its intent to create a civil remedy, provided for sanctions so punitive as to transform the civil remedy into a criminal penalty.

Syl. pt. 1, in part, *State ex rel. Palumbo v. Graley's Body Shop, Inc.*, 188 W. Va. 501, 425 S.E.2d 177 (1992). As a general matter, when courts are asked to determine whether a statutory penalty is criminal or civil, it is because a litigant seeks to raise constitutional rights that are protected in criminal proceedings. *See Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 185-86, 83 S. Ct. 554, 576-77, 9 L. Ed. 2d 644 (1963) (finding civil penalties "punitive and as such cannot constitutionally stand, lacking as they do the procedural safeguards which the Constitution commands"); *Town of Babylon v. Pekich*, Nos. 2010-113 S C, 2010-114 S C, 2010-506 S C, 2010-508 S C, 2010-510 S C, 2010-513 S C, 2010-518 S C, 2010-522 S C, 2010-524 S C, and 2010-525 S C, 2011 WL 3689379, at *1 (N.Y. App. Term Aug. 16, 2011)
(continued...)

23

how this would lead to the conclusion that Rule 1.7(b) is violated by the appointment of the special assistant attorneys general.

We fail to see how *recommending* penalties to the Attorney General, in and of itself, presents a conflict of interest by the special assistant attorneys general. First, recommendations are mere suggestions that can be rejected. Second, the complaints in this matter demonstrate that the Attorney General determined and set out the penalties sought in these cases. The complaints meticulously set out penalties ranging from monetary to injunctive relief. The complaints were styled in the name of the Attorney General, on behalf of the State, and were signed by the Chief Deputy Attorney General.[36] Insofar as the evidence demonstrates that the Attorney General chose and approved of the penalties to be sought if liability was established, we find the Petitioners' arguments in this regard do not support a violation of Rule 1.7(b).

---

[35](...continued)
("[W]e find that the Fourth Amendment applies to this quasi-criminal action to enforce provisions of a municipal code and recover penalties[.]"); *City of Jackson v. Butler*, 10 S.W.3d 250, 253 (Tenn. Ct. App. 1999) ("While it has been held that the exclusionary rule does not apply to a civil proceeding, it is usually held that the rule applies to a civil proceeding which is quasi-criminal in nature, or in which the government is seeking to exact a penalty or in some way punish a person."); *Sims v. State Tax Comm'n*, 841 P.2d 6, 13-15 (Utah 1992) (holding exclusionary rule applied to civil proceeding when proceeding was quasi-criminal and law enforcement entities were financially motivated to acquire evidence of tax violations based on statutory provision for distribution of sixty percent of taxes, penalties, and interest collected to law enforcement agency).

[36]The complaints also were signed by one of the special assistant attorneys general.

**2.  Maximizing attorney's fees based upon penalties pursued.**   The

Petitioners also appear to be making a general argument, not in the context of Rule 1.7(b),

that the special assistant attorneys general will prosecute this case in a manner that

maximizes their interests in attorney's fees by seeking penalties based on their own financial

interests, rather than based on an impartial sense of justice or the public's interest.[37]  We

reject this argument for three reasons.  First, the Petitioners have failed to show how any

attorney's fee recovered by the special assistant attorneys general is inextricably tied to the

nature of the relief obtained, if they are successful.  In other words, there is nothing in the

record, statutes, or case law which states that the actual amount of attorney's fees awarded

is exclusively dependent on the nature of the relief obtained.[38]  Second, the Petitioners fail

---

[37]Petitioner GlaxoSmithKline also makes this general argument.

[38]The standard for determining the amount of an award of attorney's fees is set
out in Syllabus point 4 of *Aetna Casualty and Surety Co. v. Pitrolo*, 176 W. Va. 190, 342
S.E.2d 156 (1986):

> Where attorney's fees are sought against a third party, the
> test of what should be considered a reasonable fee is determined
> not solely by the fee arrangement between the attorney and his
> client.  The reasonableness of attorney's fees is generally based
> on broader factors such as: (1) the time and labor required; (2)
> the novelty and difficulty of the questions; (3) the skill requisite
> to perform the legal service properly; (4) the preclusion of other
> employment by the attorney due to acceptance of the case; (5)
> the customary fee; (6) whether the fee is fixed or contingent; (7)
> time limitations imposed by the client or the circumstances; (8)
> the amount involved and the results obtained; (9) the experience,

(continued...)

25

to acknowledge that the Attorney General monitors the litigation in this case. The special assistant attorneys general do not have absolute control of the litigation. The appointment letters provided to the special assistant attorneys general state:

> In keeping with the Attorney General's policies and practices, it is anticipated that this office will be kept apprised of any and all actions taken in this case, and it is anticipated that we will have regular ongoing discussions regarding tactics and strategy.

Based upon the wording of the appointment letters, the Attorney General retained the authority to decide strategy and tactics. Third, the Petitioners appear to not fully understand that the issue of the amount of attorney's fees is purely discretionary with the trial court. Success by the special assistant attorneys general does not result in any predetermined amount of attorney's fees. The trial court determines the amount, if any, of attorney's fees to be awarded. *See* Syl. pt. 2, *Sally–Mike Props. v. Yokum*, 179 W. Va. 48, 365 S.E.2d 246 (1986) ("As a general rule each litigant bears his or her own attorney's fees absent a contrary rule of court or express statutory or contractual authority for reimbursement.").

---

[38](...continued)
reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

**3. Application of *Clancy*.**  The Petitioners in Case No. 13-0086 ask this Court to follow the decision in *People ex rel. Clancy v. Superior Court*, 218 Cal. Rptr. 24 (Cal. 1985), in order to find that the special assistant attorneys general have a financial conflict of interest.[39]  In *Clancy,* the City of Corona hired a private attorney to prosecute a nuisance action against the owner of a store that sold sexually explicit reading materials and provided an arcade section for viewing sexually explicit films.  The case was brought to the California Supreme Court on extraordinary writs by both parties to the action.  The defendant bookstore owner asked the Supreme Court to disqualify the city's private attorney because of the fee arrangement with the city.  Under that arrangement, the private attorney was guaranteed $30.00 per hour, but could receive $60.00 per hour if the city was successful and it obtained attorney's fees from the defendant.  The California Supreme Court found the fee arrangement to be improper and disqualified the attorney:

> In the case at bar, Clancy has an interest in the result of the case: his hourly rate will double if the City is successful in the litigation. Obviously this arrangement gives him an interest extraneous to his official function in the actions he prosecutes on behalf of the City.
>
> . . . .
>
> [T]he abatement of a public nuisance involves a balancing of interests. On the one hand is the interest of the people in ridding their city of an obnoxious or dangerous condition; on the other hand is the interest of the landowner in using his property as he wishes. And when an establishment such as an adult bookstore is the subject of the abatement action, something more is added

---

[39]The brief of Petitioner GlaxoSmithKline does not cite to this case.

to the balance: not only does the landowner have a First Amendment interest in selling protected material, but the public has a First Amendment interest in having such material available for purchase. Thus, as with an eminent domain action, the abatement of a public nuisance involves a delicate weighing of values. Any financial arrangement that would tempt the government attorney to tip the scale cannot be tolerated.

Public nuisance abatement actions share the public interest aspect of eminent domain and criminal cases, and often coincide with criminal prosecutions. These actions are brought in the name of the People by the district attorney or city attorney. A person who maintains or commits a public nuisance is guilty of a misdemeanor. . . . A suit to abate a public nuisance can trigger a criminal prosecution of the owner of the property. This connection between the civil and criminal aspects of public nuisance law further supports the need for a neutral prosecuting attorney.

*Clancy*, 218 Cal. Rptr. at 28-30 (citations omitted).

Although the Petitioners seek to have this Court follow *Clancy*, it is quite obvious that *Clancy* is distinguishable from the facts of the instant case. To begin, *Clancy* involved a private attorney prosecuting a civil action for alleged conduct that also was criminal. The Petitioners in the instant case have not cited to any criminal component to the allegations set out in the civil complaints.[40] Next, the private attorney in *Clancy* was guaranteed an hourly fee and could have his fee doubled if successful. In the instant case,

---

[40]There is a criminal component to the Consumer Credit and Protection Act for certain conduct. *See* W. Va. Code § 46A-5-103 (1996) (Repl. Vol. 2006). However, the Petitioners have not argued that any of the criminal offenses under that statute have application to their alleged conduct.

the special assistant attorneys general are not guaranteed any fee and could be denied the same by the trial judge even if successful.[41]  Finally, the private attorney in *Clancy* acted independently of the city's attorney and had absolute control of the litigation.[42]  In the instant case, the Attorney General retained ultimate control of litigation strategy and tactics.  This latter issue was squarely addressed by the California Supreme Court in the recent case of *County of Santa Clara v. Superior Court*, 112 Cal. Rptr. 3d 697 (Cal. 2010).

In *Santa Clara*, several California counties and cities prosecuted a public nuisance action against numerous businesses that manufactured lead paint.  The government entities were represented by both their own government attorneys and by several private law firms.  The private law firms were retained by the government entities on a contingent fee basis.  The issue presented to the California Supreme Court was whether the trial court was correct in relying on *Clancy* to prohibit compensation to the privately retained counsel or whether the court of appeal was correct in holding that *Clancy* did not prohibit compensating private attorneys on a contingent fee basis when they are under the supervision of

---

[41]Indeed, W. Va. Code § 46A-7-111(1) (1999) (Repl. Vol. 2006) provides that "[i]f the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error, no liability to pay a penalty shall be imposed under this subsection."

[42]This point is important because the California Supreme Court indicated that the city could retain the private attorney in the case to represent the city attorney if the city attorney filed the action in the name of the city attorney.  *See Clancy*, 218 Cal. Rptr. at 30 n.5 ("Thus on remand the action herein should be brought in the name of Dallas Holmes, the Corona City Attorney.  The City may hire Clancy to represent Holmes.").

29

government attorneys.  The Supreme Court agreed with the court of appeal:

> There is no indication that the contingent-fee arrangements in the present case have created a danger of governmental overreaching or economic coercion.  Defendants are large corporations with access to abundant monetary and legal resources.  Accordingly, the concern we expressed in *Clancy* about the misuse of governmental resources against an outmatched individual defendant is not implicated in the present case.
>
> Thus, because–in contrast to the situation in *Clancy*– neither a liberty interest nor the right of an existing business to continued operation is threatened by the present prosecution, this case is closer on the spectrum to an ordinary civil case than it is to a criminal prosecution.  The role played in the current setting both by the government attorneys and by the private attorneys differs significantly from that played by the private attorney in *Clancy*.  Accordingly, the absolute prohibition on contingent-fee arrangements imported in *Clancy* from the context of criminal proceedings is unwarranted in the circumstances of the present civil public-nuisance action.
>
> . . . .
>
> We generally agree with the . . . Court of Appeal in the present case that there is a critical distinction between an employment arrangement that fully delegates governmental authority to a private party possessing a personal interest in the case, and an arrangement specifying that private counsel remain subject to the supervision and control of government attorneys.  Private counsel serving in a subordinate role do not supplant a public entity's government attorneys, who have no personal or pecuniary interest in a case and therefore remain free of a conflict of interest that might require disqualification.  Accordingly, in a case in which private counsel are subject to the supervision and control of government attorneys, the discretionary decisions vital to an impartial prosecution are made by neutral attorneys and the prosecution may proceed with the assistance of private counsel, even though the latter have a pecuniary interest in the case.

It is true that the public attorneys' decisionmaking conceivably could be influenced by their professional reliance upon the private attorneys' expertise and a concomitant sense of obligation to those attorneys to ensure that they receive payment for their many hours of work on the case. This circumstance may fairly be viewed as being somewhat akin to having a personal interest in the case. Nevertheless, this is not the type of personal conflict of interest that requires disqualification. . . . Almost any fee arrangement between attorney and client may give rise to a conflict. . . . The contingent fee contract so common in civil litigation creates a conflict when either the attorney or the client needs a quick settlement while the other's interest would be better served by pressing on in the hope of a greater recovery. The variants of this kind of conflict are infinite. Fortunately most attorneys serve their clients honorably despite the opportunity to profit by neglecting or betraying the client's interest.

As recognized by the American Bar Association, attorneys are expected to resolve conflicts between their personal interests and their ethical and professional responsibilities through the exercise of sensitive professionalism and moral judgment. In other words, attorneys are presumed to comport themselves with ethical integrity and to abide by all rules of professional conduct.

*Santa Clara*, 112 Cal. Rptr. 3d at 713-17 (internal quotations and citations omitted).

The decision in *Santa Clara* is factually similar to the instant case with respect to two critical issues. The government entities in *Santa Clara* had both private and public counsel. In this proceeding, the Chief Deputy Attorney General is counsel of record along with the special assistant attorneys general. Most importantly, in both *Santa Clara* and the instant case, private attorneys are subject to supervision by government attorneys.

31

In the final analysis, the Petitioners have failed to present any evidence that the financial interests of the special assistant attorneys general is in conflict with that of their client and therefore violative of Rule 1.7(b). *See In re T.R.*, 606 S.E.2d 630, 632 (Ga. Ct. App. 2004) ("[A] person must demonstrate an actual conflict of interest affecting the performance of a lawyer who works as a part-time [special assistant attorney general], not just the mere possibility of a conflict.").

### C. The Attorney General's Authority to Appoint Special Assistant Attorneys General

The final issue raised by the Petitioners is that the Attorney General lacks authority to appoint special assistant attorneys general.[43] The Petitioners support this argument by asserting that, under Article VII, Section 1 of the West Virginia Constitution, the Legislature has been given exclusive authority to set out the duties of the Attorney General but that the Legislature has not granted the Attorney General the authority to appoint special assistant attorneys general. Further, the Petitioners contend that, by virtue of Article VII, Section 1, the Attorney General does not have common law authority to appoint special assistant attorneys general. Finally, it is argued by the Petitioners that, even if the Attorney General had authority to appoint special assistant attorneys general, he did not have authority to enter a fee arrangement with them.

---

[43]This issue was briefed by the parties in both petitions.

As a preliminary matter, we observe that, although this Court is vested with the authority "to construe, interpret and apply provisions of the Constitution, . . . [we] may not add to, distort or ignore the plain mandates thereof." *State ex rel. Bagley v. Blankenship*, 161 W. Va. 630, 643, 246 S.E.2d 99, 107 (1978). "If a constitutional provision is clear in its terms, and the intention of the electorate is clearly embraced in the language of the provision itself, this Court must apply and not interpret the provision." Syl. pt 1, *State ex rel. Trent v. Sims*, 138 W. Va. 244, 77 S.E.2d 122 (1953). "However, if the language of the constitutional provision is ambiguous, then the ordinary principles employed in statutory construction must be applied to ascertain such intent." *State ex rel. Forbes v. Caperton*, 198 W. Va. 474, 480, 481 S.E.2d 780, 786 (1996) (internal quotations and citations omitted).

We begin by observing that Article VII, Section 1 of the West Virginia Constitution establishes the creation of the Office of Attorney General:

> The executive department shall consist of a governor, secretary of state, auditor, treasurer, commissioner of agriculture and *attorney general*, who shall be ex officio reporter of the court of appeals. Their terms of office shall be four years and shall commence on the first Monday after the second Wednesday of January next after their election. They *shall reside at the seat of government during their terms of office, keep there the public records, books and papers pertaining to their respective offices and shall perform such duties as may be prescribed by law*.

(Emphasis added). *See* Syl. pt. 2, *State ex rel. McGraw v. Burton*, 212 W. Va. 23, 569 S.E.2d 99 (2002) ("Pursuant to Article VII, Section 1 of the West Virginia Constitution, the

Attorney General of the State of West Virginia is the State's chief legal officer, which status necessarily implies having the constitutional responsibility for providing legal counsel to State officials and State entities."). It is obvious that Article VII, Section 1 does not expressly grant nor deny the Attorney General the authority to appoint special assistant attorneys general. Put simply, the constitutional provision is silent on the issue.

Under Article VII, Section 1, the Attorney General is required to be the reporter of the opinions of this Court, reside at the seat of government, and maintain the office's public records, books, and papers. The last clause of Article VII, Section 1, "shall perform such duties as may be prescribed by law," expressly authorizes the Legislature to establish duties of the Attorney General's office.

The Petitioners note that the Legislature has expressly provided for the appointment of assistant attorneys general and the method of their payment under W. Va. Code § 5-3-3 (1961) (Repl. Vol. 2011).[44] However, according to the Petitioners, this statute does not authorize the appointment of special assistant attorneys general. Further, the Petitioners contend that, under this Court's decision in *Manchin v. Browning*, 170 W. Va. 779, 296 S.E.2d 909 (1982), the Attorney General does not have common law authority to appoint special assistant attorneys general. We will examine both contentions separately

---

[44]See Section III.C.2., *infra*, for further treatment of W. Va. Code § 5-3-3 (1961) (Repl. Vol. 2011).

below.

**1. The Attorney General's common law authority.** The issue of the common law authority of the Attorney General was first addressed by this Court in *State v. Ehrlick*, 65 W. Va. 700, 64 S.E. 935 (1909). The decision in *Ehrlick* addressed the issue of whether a county prosecutor could file a petition for an injunction in the name of the State. The prosecutor filed the petition to enjoin the defendants from carrying on a horse racing gambling operation. After a circuit court granted the prosecutor the relief requested, the defendants appealed. The defendants contended on appeal that only the Attorney General had authority to bring the civil petition in the name of the State. This Court agreed with the defendants. In discussing the powers of the Attorney General and prosecutor, the opinion noted that the Attorney General possessed common law powers. While not dispositive for reversing the trial court's injunction, the opinion held in Syllabus point 2 that, "[a]s the chief law officer of the state, the Attorney General is clothed and charged with all the common–law powers and duties pertaining to his office, except in so far as they have been limited by statute." Syl. pt. 2, *Ehrlick*, 65 W. Va. 700, 64 S.E. 935.

*Ehrlick's* recognition that the Attorney General had common law powers remained unassailable law until the decision in *Manchin v. Browning*, 170 W. Va. 779, 296 S.E.2d 909 (1982). In *Manchin*, the Secretary of State filed a petition for a writ of mandamus with this Court seeking to compel the Attorney General to represent the Secretary of State's

35

office in a federal litigation. While the case was pending, the federal lawsuit settled. However, the Court determined that it would address the issue of the duty of the Attorney General to represent State officials. In resolving this issue, the opinion in *Manchin* ventured off into sweeping dicta that called into question whether the Attorney General had common law powers.

The decision in *Manchin* relied upon the status of the Office of Attorney General in Virginia, prior to the start of the Civil War, in order to conclude that West Virginia's Attorney General did not have common law powers. The opinion in *Manchin* said the following regarding the Attorney General's status in pre-Civil War Virginia:

> As a consequence of the American Revolution, the executive powers of the Crown office of Attorney General underwent substantial modification in Virginia. The first constitution of Virginia, adopted June 29, 1776, recognized the Attorney General as a judicial officer, thereby removing him from the executive department. He was appointed by and served at the pleasure of the General Assembly and was commissioned by the Governor. In addition, the Attorney General was specifically prohibited from holding elected office in either the legislative or executive department. This constitution continued in force until superseded by an amended constitution, submitted by the General Assembly on January 15, 1830. The provisions of the amended constitution relating to the office of Attorney General were altered little. The Attorney General remained an officer of the judicial department, was appointed and commissioned in the same manner and continued to serve at the pleasure of the General Assembly.
>
> The 1850 Virginia Constitution made some sweeping changes in the office. It provided for the first time for the election of the Attorney General by the voters of the

Commonwealth and established a definite term of office. The Attorney General continued to serve as an officer of the judiciary, however, and the amended constitution provided "[h]e . . . shall perform such duties and receive such compensation as may be prescribed by law, and be removable in the manner prescribed for the removal of judges." Va. Const. of 1850, art. VI, § 22.

*Manchin*, 170 W. Va. at 784, 296 S.E.2d at 914 (additional citation omitted). As a result of Virginia's Office of Attorney General being a part of the judiciary, the opinion in *Manchin* made an overly broad conclusion that Virginia's Attorney General did not have common law powers.[45]

After concluding that the Attorney General of Virginia did not have common law powers, *Manchin* reasoned that the wording of West Virginia's Constitution, Article VII, Section 1, had to be interpreted as not allowing West Virginia's Attorney General to have common law powers. The convoluted reasoning of *Manchin* was as follows:

The plain language of this constitutional provision, [Article VII, Section 1,] when viewed against the historical backdrop of the development of the office of Attorney General in the Virginias, leads us to conclude that the Attorney General of West Virginia does not possess the common law powers attendant to that office in England and in British North America during the colonial period. By removing the traditional executive office of Attorney General to the judicial department and establishing a tri-partite state government, with separate legislative, executive and judicial departments, the framers of the first Virginia Constitution in effect abrogated any common

---

[45]Other than the dicta in *Manchin*, no authority was cited to support this conclusion.

37

law executive powers the holder of that office may have had. The executive function formerly exercised by the Attorney General at common law was extinguished, and for the next 96 years he remained a minor judicial officer, prohibited by the separation of powers from wielding the common law legislative and executive powers traditional to the office in Great Britain.

By the provisions of our present constitution, the Attorney General is once again an officer of the executive department. However, his return to the executive department did not revive the common law powers of the office. The people of West Virginia specifically expressed their intent that the Attorney General should not exercise those powers by providing that he "shall perform such duties as may be prescribed by law." Under settled rules of construction, the word "shall" when used in constitutional provisions is ordinarily taken to have been used mandatorily, and the word "may" generally should be read as conferring both permission and power. The phrases "prescribed by law" and "provided by law" mean prescribed or provided by statutes. The plain effect of the provision is to limit the powers of the Attorney General to those conferred by law laid down pursuant to the constitution. Consequently we conclude that the powers and duties of the Attorney General are specified by the constitution and by rules of law prescribed pursuant thereto. We hereby overrule *State v. Ehrlick*, *supra*, insofar as it conflicts with this view.

*Manchin*, 170 W. Va. at 785, 296 S.E.2d at 915 (citations omitted).

Before turning to the decision of this Court that modified *Manchin's* denial of inherent powers to the Attorney General, we pause to note that *Manchin* appears to have incorrectly reported that Virginia's pre-Civil War Attorney General did not have common law powers. The 1808 Virginia Supreme Court opinion in *Dew v. Sweet Springs District Court Judges*, 13 Va. 1 (1808), touched upon the issue of the Attorney General's inherent

38

common law powers.

In *Dew*, the appellant was appointed to fill a vacancy as clerk of a district court. However, he was not allowed to take office because he failed to post the bond that was required before the position could be officially filled. As a consequence, the appellee was appointed to fill the vacancy. The appellant filed a petition for mandamus with a trial court seeking to remove the appellee from the office of court clerk. The trial court denied the petition upon finding mandamus was not the proper remedy. In the appeal, the Virginia Supreme Court cited to arguments suggesting an "information in the nature of a quo warranto" was the proper filing instrument for the appellant to obtain relief. The arguments contended that an information was a common law instrument and that only the Attorney General had common law authority to file the same. However, the Supreme Court determined that an information was not a proper instrument in the case because it could be filed only in a criminal prosecution, and no one had committed a crime regarding the clerk's vacancy:

> But it is objected that the information is not given by the statute, but existed at common law. It certainly existed at common law, but only as a proceeding on the criminal side: it was first given to the party, as a civil remedy, by the statute. . . .
>
> The Attorney-General, at common law, is not bound to file an information when a criminal act has not been committed. Now what crime has [the appellee] been guilty of in accepting an office before declared vacant by the Judges, and the exercise of which was necessary to the public good?

. . . .

> On general principles, therefore, it would seem to be more proper, (or rather less objectionable,) to turn over the party to his private and more speedy remedy under the statute, than to the common law information, which he cannot use without the intervention of the prerogative, or the permission of the Attorney-General, and the proceedings on which are, perhaps, more dilatory than in the other case.

*Dew*, 13 Va. at 12-23.

The decision in *Dew* is important for one purpose. The decision illustrates, contrary to *Manchin*, that the court in *Dew* believed that Virginia's Attorney General had common law powers prior to the Civil War. Further, under the current laws of the State of Virginia, the Attorney General is recognized as having certain common law powers. *See, e.g.*, *Commonwealth ex rel. Beales v. JOCO Found.*, 558 S.E.2d 280, 284 (Va. 2002) (recognizing Attorney General has common law authority over certain nonprofit health care litigation); *Tauber v. Commonwealth*, 499 S.E.2d 839, 842 (Va. 1998) ("This Court long ago recognized the common law authority of the Attorney General to act on behalf of the public in matters involving charitable assets." (citing *Clarke v. Oliver*, 22 S.E. 175 (Va. 1895))).

The correctness of *Manchin's* wholesale rejection of inherent powers in the Office of Attorney General was challenged and modified in *State ex rel. McGraw v. Burton*, 212 W. Va. 23, 569 S.E.2d 99 (2002). In *Burton*, the Attorney General filed a petition for a writ of mandamus with this Court seeking to compel State agencies to use only private

legal counsel approved by the Attorney General and to make all in-house State agency lawyers employees of the Attorney General. This Court initially noted that the respondents, the parties opposed to the Attorney General's petition, contended that, as a result of the "as may be prescribed by law" language in Article VII, Section 1, "the Legislature has essentially plenary and unfettered discretion to, through statutory action, delineate, limit, or even effectively eliminate the Attorney General's role in providing legal counsel and representation to State entities." *Burton*, 212 W. Va. at 29, 569 S.E.2d at 105. The position of the respondents was rejected:

> We believe it is clear . . . that there are certain core functions of the Office of Attorney General that are inherent in the office, of which the Office of Attorney General may not be deprived, and which may not be transferred to or set up in conflict with other offices. The suggestion by some of the respondents that the Legislature possesses unfettered discretion to define, delineate, and limit the duties of the Attorney General is wholly at odds with the historical and well-settled understanding of the constitutional role of the Attorney General. Accordingly, we hold that pursuant to Article VII, Section 1 of the West Virginia Constitution, the Attorney General of the State of West Virginia is the State's chief legal officer, which status necessarily implies having the constitutional responsibility for providing legal counsel to State officials and State entities.

*Burton*, 212 W. Va. at 31-32, 569 S.E.2d at 107-08.

The next issue taken up by *Burton* was whether the Legislature could, as held in *Manchin*, strip the Office of Attorney General of all of its inherent powers. The decision determined that under the separation of powers doctrine the Legislature could not deny the

41

Office of Attorney General all of its inherent powers. *Burton* found that "[o]ne aspect [of the separation of powers doctrine] is the constitutional inability of the Legislature to define the powers and duties of the Office of Attorney General . . . so as to deprive the Office of Attorney General . . . of the inherent functions and purposes thereof." *Burton*, 212 W. Va. at 33, 569 S.E.2d at 109. *Burton* concluded that "no statute, policy, rule, or practice may constitutionally operate, alone or cumulatively, to limit, reduce, transfer, or reassign the duties and powers of the Office of the Attorney General in such a fashion as to prevent that office from performing its inherent constitutional functions." *Burton*, 212 W. Va. at 41, 569 S.E.2d at 117.[46]

In sum, under *Burton*, the Legislature does not have the unfettered discretion

---

[46]The decision in *Burton* granted the requested writ, as moulded, to reflect the following:

> [I]n all instances when an executive branch or related State entity is represented by counsel before a tribunal, the Attorney General shall appear upon the pleadings as an attorney of record; however, this requirement does not bar other counsel from also appearing and acting in a legal capacity for the State entity. The Attorney General additionally has the right to appear as an intervenor as Attorney General on behalf of the State in all proceedings where the interest of the State or a State entity is at issue, to assert the Attorney General's view of the law on behalf of the State. To maintain a proper constitutional balance, however, this right must always be exercised with restraint and due respect by the State entity and the Attorney General.

*Burton*, 212 W. Va. at 41, 569 S.E.2d at 117 (footnote omitted).

42

or authority recognized in *Manchin* to nullify all of the inherent powers of the Office of Attorney General. Of course, one of the Attorney General's inherent powers expressly nullified in *Manchin* was the common law powers of the Office. *See CSWS, L.L.C. v. Village of Bedford Park*, No. 1-11-3814, 2012 WL 6861371, at *4 (Ill. App. Ct. Dec. 31, 2012) ("[T]he Attorney General has inherent common law powers[.]"); *Dunn v. Schmid*, 60 N.W.2d 14, 17 n.1 (Minn. 1953) ("[T]he attorney general, in addition to his powers expressly conferred upon him by statute, is possessed of extensive common-law powers which are inherent in his office."). *Manchin* held that such powers did not exist because of Virginia's position on the issue, and because our Legislature was given unfettered discretion to determine the duties and powers of the Office. Insofar as we have shown that *Manchin* incorrectly interpreted the common law powers of Virginia's Attorney General, and *Burton* has rejected *Manchin's* holding that the Attorney General has no inherent authority, we make clear and once again expressly hold that the Office of Attorney General retains inherent common law powers, when not expressly restricted or limited by statute.[47] The extent of

---

[47]A majority of jurisdictions also have held that the Office of Attorney General retains inherent common law powers. *See Ex parte King*, 59 So. 3d 21 (Ala. 2010); *Botelho v. Griffin*, 25 P.3d 689 (Alaska 2001); *Masterson v. State ex rel. Bryant*, 949 S.W.2d 63 (Ark. 1997); *People ex rel. Harris v. Rizzo*, 154 Cal. Rptr. 3d 443 (Cal. Ct. App. 2013); *People ex rel. Salazar v. Davidson*, 79 P.3d 1221 (Colo. 2003); *Seth v. State*, 592 A.2d 436 (Del. 1991); *Bondi v. Tucker*, 93 So. 3d 1106 (Fla. Dist. Ct. App. 2012); *In re Water Use Permit Applications*, 9 P.3d 409 (Haw. 2000); *Newman v. Lance*, 922 P.2d 395 (Idaho 1996); *People v. Buffalo Confectionery Co.*, 401 N.E.2d 546 (Ill. 1980); *Zoeller v. East Chicago Second Century, Inc.*, 904 N.E.2d 213 (Ind. 2009); *Memorial Hosp. Ass'n, Inc. v. Knutson*, 722 P.2d 1093 (Kan. 1986); *Commonwealth ex rel. Conway v. Thompson*, 300 S.W.3d 152 (Ky. 2009); *City of Augusta v. Attorney Gen.*, 943 A.2d 582 (Me. 2008); *Case of Opare*, 932 N.E.2d 863
(continued...)

43

those powers is to be determined on a case-by-case basis. Insofar as the decision in *Manchin v. Browning*, 170 W. Va. 779, 296 S.E.2d 909 (1982), is inconsistent with this holding, it is expressly overruled.

We are mindful that the doctrine of stare decisis instructs us to be cautious in deciding whether to overrule precedent. "[T]he doctrine of *stare decisis* requires this Court to follow its prior opinions." *State Farm Mut. Auto. Ins. Co. v. Rutherford*, 229 W. Va. 73, 83, 726 S.E.2d 41, 51 (2011) (Davis, J., concurring, in part, and dissenting, in part). In

[47](...continued)
(Mass. App. Ct. 2010); *Fieger v. Cox*, 734 N.W.2d 602 (Mich. Ct. App. 2007); *State v. Ri-Mel, Inc.*, 417 N.W.2d 102 (Minn. Ct. App. 1987); *Barbour v. State ex rel. Hood*, 974 So. 2d 232 (Miss. 2008); *State ex rel Nixon v. American Tobacco Co., Inc.*, 34 S.W.3d 122 (Mo. 2000); *Montana Power Co. v. Montana Dep't of Pub. Serv. Regulation*, 709 P.2d 995 (Mont. 1985); *State v. Douglas*, 349 N.W.2d 870 (Neb. 1984); *State v. Moore*, 207 P. 75 (Nev. 1922); *Eames v. Rudman*, 333 A.2d 157 (N.H. 1975); *Kershenblatt v. Kozmor*, 624 A.2d 1042 (N.J. Super. Ct. Law. Div. 1993); *People ex rel. Spitzer v. Grasso*, 836 N.Y.S.2d 40 (N.Y. App. Div. 2007); *Bailey v. State*, 540 S.E.2d 313 (N.C. 2000); *State v. Hagerty*, 580 N.W.2d 139 (N.D. 1998); *State ex rel. Merrill v. Ohio Dep't of Natural Res.*, 955 N.E.2d 935 (Ohio 2011); *State ex rel. Cartwright v. Georgia-Pacific Corp.*, 663 P.2d 718 (Okla. 1982); *People v. Debt Reducers, Inc.*, 484 P.2d 869 (Or. Ct. App. 1971); *State v. Lead Indus. Ass'n, Inc.*, 951 A.2d 428 (R.I. 2008); *State ex rel. Comm'r of Transp. v. Medicine Bird Black Bear White Eagle*, 63 S.W.3d 734 (Tenn. Ct. App. 2001); *Hansen v. Utah State Ret. Bd.*, 652 P.2d 1332 (Utah 1982); *McLaughlin v. State*, 642 A.2d 683 (Vt. 1994); *Commonwealth ex rel. Beales v. JOCO Found.*, 558 S.E.2d 280 (Va. 2002). A minority of states do not recognize the inherent common law powers of the Office of Attorney General. *See Fund Manager, Pub. Safety Pers. Ret. Sys. v. Corbin*, 778 P.2d 1244 (Ariz. Ct. App. 1988); *Blumenthal v. Barnes*, 804 A.2d 152 (Conn. 2002); *State v. Blyth*, 226 N.W.2d 250 (Iowa 1975); *State v. Burning Tree Club*, 481 A.2d 785 (Md. 1984); *State v. Block*, 263 P.3d 940 (N.M. Ct. App. 2011); *Meyer v. Community Coll. of Beaver Cnty.*, 30 A.3d 587 (Pa. Commw. Ct. 2011); *City of Seattle v. McKenna*, 259 P.3d 1087 (Wash. 2011); *State v. City of Oak Creek*, 605 N.W.2d 526 (Wis. 2000). We could not find a definitive ruling on the subject in six states: Georgia, Louisiana, South Carolina, South Dakota, Texas, and Wyoming.

Syllabus point 2 of *Dailey v. Bechtel Corp.*, 157 W. Va. 1023, 207 S.E.2d 169 (1974), we held that "[a]n appellate court should not overrule a previous decision . . . without evidence of changing conditions or serious judicial error in interpretation sufficient to compel deviation from the basic policy of the doctrine of stare decisis, which is to promote certainty, stability, and uniformity in the law." Of course, "the doctrine of *stare decisis* is not sacrosanct, and in rare instances there are valid reasons to depart from it." *Griffith v. ConAgra Brands, Inc.*, 229 W. Va. 190, ___, 728 S.E.2d 74, 85 (2012) (Benjamin, J., concurring). Therefore, "when it clearly is apparent that an error has been made or that the application of an outmoded rule, due to changing conditions, results in injustice, deviation from that policy is warranted." *Woodrum v. Johnson*, 210 W. Va. 762, 766 n.8, 559 S.E.2d 908, 912 n.8 (2001) (internal quotations and citations omitted).

In this proceeding, "[o]ur decision to depart from stare decisis is based upon a 'serious judicial error' in the [*Manchin*] opinion." *State v. Mullens*, 221 W. Va. 70, 91, 650 S.E.2d 169, 190 (2007) (footnote omitted). Our decision to overrule *Manchin* is based upon the clear language of our Constitution. In a conclusory fashion, *Manchin* indicated that the phrase "as prescribed by law," contained in Article VII, Section 1, meant that the only powers the Office of Attorney General possessed were those expressly granted by the Legislature. Such an interpretation is inconsistent with both the generally recognized meaning attributed to the phrase "as prescribed by law" and Article VIII, Section 13 of our Constitution.

45

First, contrary to *Manchin's* interpretation of the clause "as prescribed by law," a Virginia court has recognized that, "[i]n most states where the constitution says that the attorney general's duties shall be 'as prescribed by law,' this is taken to mean that he has such common law powers as have not been specifically repealed by statute[.]" *Terry v. Wilder*, Chancery No. HC-1307-2, 1992 WL 885093, at *8 (Va. Cir. Ct., City of Richmond Dec. 29, 1992). *See People ex rel. Devine v. Time Consumer Mktg., Inc.*, 782 N.E.2d 761, 765 (Ill. App. Ct. 2002) ("Our supreme court has interpreted this provision to mean that the Illinois Attorney General is vested with those powers and duties associated with the office of Attorney General at common law as well as with whatever additional powers and duties for which the legislature provides."); *Fieger v. Cox*, 734 N.W.2d 602, 611 (Mich. Ct. App. 2007) ("The office of the attorney general enjoys a wide range of powers, derived from both the common law and, later, statutory enactments."); *State ex rel. Cartwright v. Georgia-Pacific Corp.*, 663 P.2d 718, 721 (Okla. 1982) ("Having determined that the powers and duties of the Attorney General under the Constitution of the State of Oklahoma carries with it the duties and powers as were usually incident to the office under the English common law, we must next determine whether those common law powers and duties have been modified by statutory law[.]"); *State v. Lead Indus. Ass'n, Inc.*, 951 A.2d 428, 473 (R.I. 2008) ("Accordingly, the Attorney General in Rhode Island has broad powers and responsibilities pursuant to the Rhode Island Constitution, several Rhode Island statutes, and the common law.").

46

Second, pursuant to Article VIII, Section 13 of the West Virginia Constitution, the following is stated regarding abrogating the common law of this State:

> Except as otherwise provided in this article, such parts of the common law, and of the laws of this State as are in force on the effective date of this article and are not repugnant thereto, shall be and continue the law of this State until altered or repealed by the legislature.[48]

(Footnote added). We have held that "Article VIII, Section 13 of the Constitution of West Virginia authorizes the Legislature to enact statutes that abrogate the common law[.]" *MacDonald v. City Hosp., Inc.*, 227 W. Va. 707, 715, 715 S.E.2d 405, 413 (2011). We equally have recognized that "[t]he common law, if not repugnant of the Constitution of this State, continues as the law of this State unless it is altered or changed by the Legislature." *State ex rel. Van Nguyen v. Berger*, 199 W. Va. 71, 75, 483 S.E.2d 71, 75 (1996) (internal quotations and citation omitted). *See Robinson v. Charleston Area Med. Ctr., Inc.*, 186 W. Va. 720, 727, 414 S.E.2d 877, 884 (1991) ("[T]he general authority of the legislature to alter or repeal the common law is expressly conferred by article VIII, section 13 of the *Constitution of West Virginia*." (citation and footnote omitted)). Thus, under Article VIII, Section 13, the Legislature can expressly repeal specific aspects of the Attorney General's inherent common law powers. However, contrary to *Manchin's* cavalier treatment of the

___

[48]*See* W. Va. Code § 2-1-1 (1923) (Repl. Vol. 2011) ("The common law of England, so far as it is not repugnant to the principles of the constitution of this state, shall continue in force within the same, except in those respects wherein it was altered by the general assembly of Virginia before the twentieth day of June, eighteen hundred and sixty-three, or has been, or shall be, altered by the Legislature of this state.").

subject, the "common law is not to be construed as altered or changed by statute, unless legislative intent to do so be plainly manifested." *Berger*, 199 W. Va. at 75, 483 S.E.2d at 75 (internal quotations and citation omitted). The Legislature has not enacted any general statute that attempts to strip the Office of Attorney General of all its inherent common law powers.

In the final analysis, the authority of the Office of Attorney General "comes from three sources–the constitution of this state; the legislature; and the common law, from which emanates some of its so-called inherent power." *State ex rel. McGraw v. Telecheck Servs., Inc.*, 213 W. Va. 438, 443, 582 S.E.2d 885, 890 (2003).

**2.   The power of the Attorney General to appoint special assistant attorneys general.** The Petitioners contend that the lower courts were wrong in holding that W. Va. Code § 5-3-3 (1961) (Repl. Vol. 2011) authorized the Attorney General to appoint special assistant attorneys general and provided a basis for the method of payment chosen.[49] As noted previously, "[w]hen a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute." Syl. pt. 5, *State v. General Daniel*

---

[49]The Petitioners' strongest argument on these issues was that the Attorney General lacked common law authority per se. We already have determined that the Attorney General has common law powers.

*Morgan Post No. 548, V.F.W.*, 144 W. Va. 137, 107 S.E.2d 353 (1959).

> The full language of W. Va. Code § 5-3-3 provides as follows:
>
>> The attorney general may appoint such assistant attorneys general as may be necessary to properly perform the duties of his office.  The total compensation of all such assistants shall be within the limits of the amounts appropriated by the Legislature for personal services.   All assistant attorneys general so appointed shall serve at the pleasure of the attorney general and shall perform such duties as he may require of them.
>>
>> All laws or parts of laws inconsistent with the provisions hereof are hereby amended to be in harmony with the provisions of this section.

W. Va. Code § 5-3-3.  It is clear that W. Va. Code § 5-3-3 does not mention "special" assistant attorneys general; the statute refers only to assistant attorneys general.  In deciding whether the statute was intended to include special assistant attorneys general, we will trace the relevant history of the statute.  *State v. Yoak*, 202 W. Va.  331, 333, 504 S.E.2d 158, 160 (1998) ("We begin by interjecting a history of the amendments to the statute which is controlling in this case."); *State v. D.D.*, 172 W. Va. 791, 794, 310 S.E.2d 858, 860 (1983) ("We begin by examining the . . .  history of legislative amendments to our child welfare laws[.]").

> West Virginia Code § 5-3-3 was originally enacted in 1909.  The relevant language of the original version of the statute stated the following:
>
>> [H]e [the Attorney General] is hereby authorized to appoint two

assistants to serve at his pleasure, . . . and who may perform any
of the duties of the attorney general.

W. Va. Code ch. 48, § 2a (1909).  The original version of the statute expressly authorized the

appointment of assistant attorneys general, but did not mention special assistant attorneys

general.[50]  The statute was amended in 1937 to read, in relevant part, as follows:

The attorney general may appoint four assistants to serve
at his pleasure and to perform such duties as he may require of
them. . . .   And upon finding of the necessity thereof by the
governor and attorney general, the attorney general may *appoint
not more than one special assistant* to serve at his pleasure and
to perform such duties as he may require of him for such time as
the governor and attorney general determine the necessity to
continue[.]

W. Va. Code ch. 85, § 3 (1937) (emphasis added).  It is clear that under the 1937 version of

W. Va. Code § 5-3-5, the Legislature expressly authorized the appointment of a special

assistant attorney general, in addition to the appointment of assistant attorneys general.


Express legislative authority to appoint a special assistant attorney general

remained part of the statute until 1953.  In 1953, the Legislature amended the statute and

removed the provision concerning the appointment of a special assistant attorney general.

*See* W. Va. Code ch. 11, § 3 (1953).  The current version of the statute, as set out above, does

---

[50]It should be noted that although it appears that the Attorney General did not
have express legislative authority to appoint assistant attorneys general until 1909, it does
appear that prior to that time the Attorney General exercised his inherent common law
authority to appoint assistant attorneys general. *See Ex parte Faulkner*, 1 W. Va. 269 (1866)
(discussing the position of assistant attorney general in the case).

not include a provision for the appointment of a special assistant attorney general. The

historical development of the statute invokes the Latin doctrine *inclusio unius est exclusio*

*alterius*, *i.e.*, one is the exclusion of the others. This doctrine instructs "'courts to exclude

from operation those items not included in the list of elements that are given effect expressly

by statutory language.'" *Bevins v. West Virginia Office of Ins. Comm'r*, 227 W. Va. 315,

327, 708 S.E.2d 509, 521 (2010) (quoting *State ex rel. Roy Allen S. v. Stone*, 196 W. Va. 624,

630 n.11, 474 S.E.2d 554, 560 n.11 (1996)). Thus, it is clear from historical analysis that the

Legislature did not intend for the current version of W. Va. Code § 5-3-3 to authorize the

Attorney General to appoint special assistant attorneys general.[51] The Legislature knew how

---

[51]Our conclusion also is supported by an attempted amendment to W. Va. Code § 5-3-3 during the 2013 Regular Session of the West Virginia Legislature. A bill was introduced in the House of Delegates, H.B. 3110, that would have amended the statute to once again expressly authorize the appointment of private attorneys as special assistant attorneys general. In addition, the proposed amendment set out guidelines the Attorney General had to follow in order to appoint a private attorney as a special assistant attorney general. The guidelines of the proposed amendment were, in relevant part, as follows:

> (c) The state may not enter into a contingency fee contract, or any other legal arrangement, with a private attorney unless the Attorney General makes a written determination prior to entering into such a contract that the legal representation is both cost-effective and in the best interest of the public. Any written determination shall include specific findings for each of the following factors:

> (1) Whether sufficient and appropriate legal and financial resources exist within the Attorney General's office to handle the matter.

> (2) The time and labor required; the novelty, complexity,

(continued...)

51

to expressly include such authorization, as it did so in 1937.

Even though the Attorney General cannot rely upon W. Va. Code § 5-3-3 as authority to appoint special assistant attorneys general, we do not find any language in the statute which expressly prohibits the Attorney General from making such appointments under that Office's inherent common law authority. A similar issue was addressed by the Missouri Court of Appeals in *Kinder v. Nixon*, No. 56802, 2000 WL 684860 (Mo. Ct. App. May 30, 2000), *transferred sub nom. State ex rel. Nixon v. American Tobacco Co., Inc.*, 34 S.W.3d 122 (Mo. 2000). The court in *Kinder* found that Missouri's statute (discussed in *Nixon*, *infra*) authorized the Attorney General to appoint only assistant attorneys general, not special assistant attorneys general. However, the court found that the limitation imposed by the statute did not limit the Attorney General's inherent common law authority. The court held that "the Attorney General has common law authority to appoint special assistants and nothing in [the statute] either expressly or by reasonable intendment forbids the exercise of

---

[51](...continued)
and difficulty of the questions involved; and the skill requisite to perform the attorney services properly.

(3) The geographic area where the attorney services are to be provided.

(4) The amount of experience desired for the particular kind of attorney services to be provided and the nature of the private attorney's experience with similar issues or cases.

H.B. 3110. The proposed amendment died in the House Judiciary Committee.

that power." *Kinder*, 2000 WL 684860, at *11. We agree with *Kinder* and so hold that the

Attorney General has common law authority to appoint special assistant attorneys general.[52]

_____

[52]We wish to clarify that this opinion does not address what method must be used by the Attorney General in selecting a special assistant attorney general. This was also an area that the Legislature unsuccessfully attempted to address during the 2013 Regular Session. Two bills were introduced in the House of Delegates, H.B. 2139 and H.B. 3110, that addressed the issue. House Bill 2139 would have amended W. Va. Code § 5-3-2 to provide, in relevant part, the following:

> In contracting with private attorneys to pursue legal action on behalf of the state, the Attorney General shall seek bids from attorneys licensed to practice in this state and shall contract with the best qualified attorney submitting the lowest bid.

House Bill 3110 would have amended W. Va. Code § 5-3-3 to provide, in relevant part, the following:

> (d) [T]he Attorney General shall request proposals from private attorneys to represent the state on a contingency fee basis, or any other basis, unless the Attorney General makes a written determination that one of the following factors applies:

> (1) An emergency situation exists that requires time-sensitive legal services that cannot be adequately provided by the Office of Attorney General, and for which insufficient time exists to complete the customary competitive bidding process.

> (2) An appointment, or the continuation of an appointment, is necessary to avoid disruption in pending legal matters by allowing previously appointed outside counsel to continue providing legal representation.

> (3) The legal services will be most effectively handled by preapproved attorneys who have already completed the bidding process referenced in subsection (h).

(continued...)

(e) Any Requests for Proposal shall be posted to the website of the Office of Attorney General, and the time period under which the proposal is open should be clearly stated.

(f) When soliciting proposals from private attorneys to represent the state on a contingency-fee basis, or any other basis, the Attorney General shall consider the following factors when determining the most competitive proposal for legal services, and make a written determination as to the application of these factors, prior to entering into any contract for outside legal services:

(1) Whether the private attorneys possess the requisite skills and expertise needed to handle the legal matters in question;

(2) Whether the private attorneys possess requisite staffing and support to handle the scope of the litigation or matter;

(3) Whether the private attorneys, or any members of the private attorneys' law firm, have been subject to reprimand by the West Virginia State Bar, or other entities, for unethical conduct;

(4) Whether the private attorneys have been peer rated, and if so, what peer ratings they have received, along with any other recognitions or awards for legal services;

(5) The estimated fees, costs and expenses of the private attorneys to perform the legal services requested;

(6) The willingness of the private attorneys to enter into alternative billing arrangements;

(7) Whether the private attorneys are in compliance with all applicable laws of the State of West Virginia; and

(continued...)

[52](...continued)

(8) Any such other relevant factors as may be identified by the Attorney General.

(g) If, after soliciting proposals for legal services, the Attorney General determines that proposals received are insufficient based on an application of the factors set forth in subsection (f), the Attorney General may solicit additional proposals pursuant to subsections (c), (d) and (f).

(h) In order to address time sensitive or emergency legal matters that require the use of outside counsel, but do not allow sufficient time for completion of the competitive bidding process set forth in subsections (c), (d) and (f), the Office of Attorney General may institute a prebidding process for approving lawyers or law firms to perform legal work on behalf of the state in accordance with the following factors:

(1) Private attorneys may be preapproved to perform outside counsel work in specific areas of law provided that they have gone through a request for proposal and competitive bidding process as set forth in subsections (d) and (f).

(2) In instances in which more than one lawyer or law firm has been preapproved for the provision of outside counsel legal services in an area of law, the Office of Attorney General shall perform an expedited, case-specific analysis using the factors set forth in subsection (f) to determine which lawyer or law firm would be better suited to represent the state on a particular legal matter.

(3) The office shall list any preapproved attorneys by practice area on the Attorney General's website.

Both bills, H.B. 2139 and H.B. 3110, died in the House Judiciary Committee.

The Petitioners also contend that W. Va. Code § 5-3-3 restricts compensation

of assistant attorneys general to appropriations by the Legislature; therefore, they argue, the

fee arrangement with the special assistant attorneys general is invalid.[53] A similar argument

was made in *State ex rel. Nixon v. American Tobacco Co., Inc.*, 34 S.W.3d 122 (Mo. 2000).

In *Nixon*, the Attorney General of Missouri appointed a private attorney as a special assistant

attorney general to represent the State of Missouri in tobacco litigation. Under the terms of

the appointment, the special assistant attorney general would be reimbursed for his expenses

if the litigation ended favorably to the State. Several alternative contingency fee

arrangements were made with the special assistant attorney general, including payment from

---

[53]The Petitioners also argue that W. Va. Code § 5-3-5 (1923) (Repl. Vol. 2011) requires all attorney's fees to be paid into the State treasury. This statute does not address a general award of attorney's fees. We previously have noted that the statute "provides for inclusion of the . . . nominal statutory attorney fee, in the costs of a proceeding in which [the Attorney General] appeared for the State." *Hechler v. Casey*, 175 W. Va. 434, 451 n.17, 333 S.E.2d 799, 816 n.17 (1985). *See Pauley v. Gilbert*, 206 W. Va. 114, 123, 522 S.E.2d 208, 217 (1999) ("[T]here . . . exists express statutory authority for the recovery of nominal attorney's fees in W. Va. Code § 59–2–14. This provision mandates that the clerk of a court in which a party prevails 'shall include in the costs to the prevailing party: (a) In any civil action, ten dollars. . . .'"). During oral arguments, counsel for GlaxoSmithKline contended that the statute in at least one of the claims against it, involving Medicaid, requires attorney's fees be turned over to the State. This argument does not expressly appear in GlaxoSmithKline's brief. In fact, the brief focused exclusively upon the causes of action under the West Virginia Consumer Credit and Protection Act. To the extent that the brief could be liberally construed as setting out the contention made during oral arguments, the contention has no merit. As previously noted in this opinion, the Attorney General amended its appointment letter to the special assistant attorneys general litigating the action against GlaxoSmithKline. That amendment expressly states that the special assistant attorneys general "will not receive any fee based upon any recovery by the State for harm to the State's Medicaid program that is subject to refund to the Centers for Medicare and Medicaid Services."

56

any recovery from the defendants.  One of the issues arising out of the litigation was whether the statute authorizing payment of assistant attorneys general also authorized the contingency fee arrangement made with the special assistant attorney general.  The statute stated, in relevant part, the following:

> The attorney general is hereby authorized to appoint such assistant attorneys general as may be necessary to properly perform the duties of his office and shall fix the compensation of such assistants within the limits of the amount appropriated by the general assembly.

Mo. Stat. § 27.020.1.  The Missouri Supreme Court in *Nixon* found that, notwithstanding the statute, the Attorney General had authority to enter into the fee arrangement:

> It is generally held in this country that the office of attorney general is clothed, in addition to the duties expressly defined by statute, with all the powers pertaining thereto under the common law.  A grant by statute of the same or other powers does not operate to deprive him of those belonging to the office under the common law, unless the statute, either expressly or by reasonable intendment, forbids the exercise of powers not thus expressly conferred. . . .
>
> The statute that allows for the attorney general to hire assistants and to pay them from appropriations does not prohibit the attorney general in the exercise of his common law power from entering into contingency fee arrangements or agreements that otherwise provide for civil defendants sued by the State to pay attorney fees directly to the State's outside counsel.  In the absence of a statute to the contrary, we conclude that the attorney general does have the power to enter into this type of fee arrangement with his special assistant attorneys general.

*Nixon*, 34 S.W.3d at 136 (internal quotations and citations omitted).

Insofar as W. Va. Code § 5-3-3 does not expressly prohibit the Attorney General from making alternative fee arrangements with special assistant attorneys general, we now hold that the Attorney General has common law authority to provide for compensation to be paid to special assistant attorneys general through a court-approved award of attorney's fees taken directly from the losing opponent in the litigation.

We reject outright the Petitioners' contention that such an award by a trial court must be capped at the level established by the Legislature pursuant to W. Va. Code § 5-3-3. The amount of any fee award is discretionary with the trial judge. However, we wish to make clear that we are not addressing the appropriateness of awarding attorney's fees to special assistant attorneys general directly from any actual monetary judgment award to the State because such a contingent fee agreement is not at issue in this case. We also note that the Legislature attempted to address the issue of contingency fee payment to special assistant attorneys general during the 2013 Regular Session of the West Virginia Legislature, but such proposals failed to be approved.[54]

---

[54]Through House Bill 3110, an amendment was proposed to W. Va. Code § 5-3-3 that would have added the following language to the statute:

> The state may not enter into a contingency fee contract that provides for the private attorney to receive an aggregate contingency fee in excess of:
>
> (1) Twenty-five percent of the first $10 million recovered; plus

(continued...)

# IV.

## CONCLUSION

In this proceeding, the Petitioners, defendants in two consolidated petitions for writs of prohibition, have sought to have the Respondent's special assistant attorneys general disqualified. The most glaring deficiency in the arguments made by the Petitioners is that there was not one allegation that the special assistant attorneys general have actually engaged in any improper conduct that has caused an injury. The briefs set out a plethora of allegations that involve remotely possible harmful conduct. We have not and will not interfere with or disqualify a party's counsel merely because of allegations of improper

---

[54](...continued)
      (2) Twenty percent of any portion of the recovery between $10 million and $15 million; plus

      (3) Fifteen percent of any portion of the recovery between $15 million and $20 million; plus

      (4) Ten percent of any portion of the recovery between $20 million and $25 million; plus

      (5) Five percent of any portion of the recovery exceeding $25 million.

      In no event may the aggregate contingency fee for any legal matter exceed $50 million, exclusive of reasonable costs and expenses, and irrespective of the number of lawsuits filed or the number of private attorneys retained to achieve the recovery. A contingency fee may not be based on penalties or fines awarded or any amounts attributable to penalties or fines.

As previously mentioned, House Bill 3110 died in the House Judiciary Committee. *See supra* notes 51 & 52.

conduct that has not occurred. To allow a mere possibility of improper injurious conduct to be the standard for disqualification would result in parties constantly seeking to disqualify opposing counsel because of phantom injuries. The law of disqualification cannot rest on the imagination of opposing counsel.

This case has called upon the Court to revisit its holding in *State ex rel. McGraw v. Burton*, 212 W. Va. 23, 569 S.E.2d 99 (2002), that the Office of Attorney General has inherent core functions that cannot be totally extinguished. In revisiting *Burton*, we have determined that this Court improperly held in *Manchin v. Browning*, 170 W. Va. 779, 296 S.E.2d 909 (1982), that the Office of Attorney General did not retain inherent common law powers. As a consequence, we have found it necessary to overrule *Manchin*.

In the final analysis, it is the common law authority of the Attorney General that permitted that Office to appoint the special assistant attorneys general in these cases and to provide for a method of possible recovery of attorney's fees. Thus, while we find the Circuit Courts of Mason County and Wayne County relied upon the wrong reasons for rejecting the motions to disqualify the special assistant attorneys general, those courts nevertheless were correct in denying the motions.

Accordingly, we deny the writs applied for in Case No. 13-0086 and in Case

No. 13-0102.


Writs Denied.

61