## STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**AMERICAN BITUMINOUS POWER
PARTNERS, L.P., a Delaware Limited
Partnership, PLEASANT VALLEY ENERGY
COMPANY, a California Corporation, and
AMERICAN HYDRO POWER PARTNERS, L.P.,
a Pennsylvania Limited Partnership,
Defendants Below, Petitioners**

**FILED**

**May 13, 2015**
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs) No. 14-0446** (Ohio County 13-C-196)

**HORIZON VENTURES OF WEST VIRGINIA, INC.,**
**Plaintiff Below, Respondent**

## MEMORANDUM DECISION

This case involves contractual disputes between the petitioners and defendants below, American Bituminous Power Partners, L.P., Pleasant Valley Energy Co., and American Hydro Power Partners, L.P., (collectively referred to as "AMBIT"), and the respondent and plaintiff below, Horizon Ventures of West Virginia, Inc., ("Horizon"). AMBIT owns and operates the Grant Town Power Plant ("Power Plant") located in Marion County, West Virginia. Horizon is AMBIT's landlord. AMBIT appeals the March 26, 2014, order of the Circuit Court of Ohio County, West Virginia, which granted the motion for summary judgment of Horizon with regard to two claims: (1) Horizon's claim regarding priority of rent payments; and (2) AMBIT'S counterclaim for over-payment of rent.

Upon review of the parties' arguments, the appendix record, and the pertinent authorities, this Court concludes the contracts are not clear and unambiguous on either of these issues, thus precluding summary judgment. We therefore reverse the order of the circuit court and remand this action. Given the complexity of the contractual agreements governing this dispute, we direct the circuit court to promptly transfer this case, in its entirety, to the Business Court Division. This case does not present a new or significant question of law and, therefore, satisfies the "limited circumstance" requirement of Rule 21(d) of the West Virginia Rules of Appellate Procedure. As such, it is properly resolved in this memorandum decision. [1]

---

[1] We wish to acknowledge the Amicus Curiae brief filed by the Bank Group Lenders in support of AMBIT. The Bank Group Lenders are five financial institutions that currently provide credit to AMBIT. We note the Bank Group Lenders raised issues that were not raised by the parties and discussed documents that were not included in the appendix record. "We decline to address the issues raised solely by the Amicus." *State ex rel. Discover Fin. Servs., Inc. v. Nibert*, 231 W.Va. 227, 230 n.5, 744 S.E.2d 625, 628 n.5 (2013).

1

# I. AMBIT'S CONTRACTUAL OBLIGATIONS

The Power Plant, a coal-fired facility that generates electricity, was financed substantially by $150 million in tax-exempt Solid Waste Disposal Revenue Bonds issued by the Marion County Commission, the repayment of which is governed by a Trust Indenture. The Trust Indenture sets forth the prioritization of various payments, including the essential operating costs of the plant, rent, and the principal and interest to the bondholders. AMBIT and Horizon's landlord/tenant relationship is governed by a series of leases and by an agreement to settle a previous dispute. Pursuant to these contracts, the monthly lease payment is a percentage of gross revenue received by AMBIT, with that percentage varying with the type of fuel on site. The present dispute involves the failure of AMBIT to pay Horizon the full rent due under the terms of the governing Lease Agreement. To understand the underlying litigation, we find it is necessary to briefly outline the winding interplay of three contracts, which establish AMBIT's payment obligations.

## A. Trust Indenture

The Trust Indenture was entered into between AMBIT and its lenders on January 1, 1990; it governs the terms and conditions of the payments to the bondholders and sets forth explicit instructions and requirements for the allocation of the Power Plant's revenues.[2] Under the Trust Indenture, AMBIT is required to pay to the Trustee all of its revenues upon receipt. The Trustee then deposits the revenues into the Revenue Fund. Each month, the Trustee pays certain parties out of the Revenue Fund based upon a payment hierarchy that is set out in the Trust Indenture. Of particular note is the second payment group,[3] which requires payment of the Power Plant's essential operating costs. As discussed in more detail below, AMBIT and the Amicus Curiae argue that, without this payment, the Power Plant could not operate and, therefore, could not generate enough revenue to pay AMBIT's other obligations, including the payments to the lender groups and rent to Horizon.

Under the Trust Indenture, payment groups three through six require AMBIT to make monthly deposits into various funds, including a "Bank Payment Fund" and a "Debt Service Fund." The Trustee uses these funds to make scheduled payments of principal and interest under

---

[2] In its brief, the Amicus explains the intricate details of the financing of the bonds, including the various security interests, and also explains the various agreements that set forth the rights and obligations of all of the players involved, not just AMBIT and Horizon. The Amicus argues the circuit court's summary judgment order failed to address or otherwise consider these intertwining relationships. The Amicus asserts that if not overruled, the order will trigger events of default in those financial agreements and jeopardize the future of the Power Plant. On remand, the Bank Group Lenders should consider filing a motion to intervene in this matter pursuant to Rule 24 of the West Virginia Rules of Civil Procedure.

[3] The first payment group, which is not relevant in this case, requires payment of tax on the interest on the bonds to the federal government if the interest earnings from AMBIT's various funds are not sufficient.

2

the bonds, and to pay AMBIT's obligations to reimburse the Bank Group Lenders under the Reimbursement Agreement.

The seventh payment group under the Trust Indenture provides payment for: "the Actual Operating and Maintenance Expenses referred to in paragraph Second . . . which are in excess of the limit specified in paragraph Second and to pay all *Other Lease Rent* (including accruals of interest thereon) which is then due and permitted to be paid[.]" (Emphasis added). AMBIT and the Amicus Curiae contend that, under the priority of payment hierarchy set forth in the Trust Indenture, it is under this seventh payment group that AMBIT must make rent payments. Horizon is not a party to the Trust Indenture but in its 1996 settlement agreement with AMBIT discussed below, the parties agreed that rent is payable as "Other Lease Rent" under the terms of the Trust Indenture. As stated in the Trust Indenture's seventh payment group paragraph above, rent payments must be "due and permitted" under the Lease Agreement at Sections 7 and 7A, which govern when and how rent is to be paid, and when rent is subordinated to the payment of AMBIT's other obligations.

The Trust Indenture has no bearing on the second issue on appeal, the alleged overpayment of rent.

**B. Lease Agreement**

On November 29, 1989, Horizon and AMBIT entered into an Amended and Restated Lease Agreement under which Horizon leased to AMBIT certain parcels of real property for the purpose of constructing, operating, and maintaining the Power Plant. The Lease Agreement was amended on December 28, 1989, and again on January 11, 1990.[4]

1. Priority of Rent

All rent that Horizon is claiming in this case is believed to be subordinated rent under the Lease Agreement and is governed by Section 7A of that contract. The Lease Agreement provides that AMBIT's payment of rent to Horizon is subordinated to the payment of "Senior Debt" defined as all indebtedness, obligations and liabilities of AMBIT pursuant to all notes, letters of credit, loan agreements, reimbursement agreements and/or guarantees between AMBIT and any banks or other financial institutions providing a letter of credit or other form of security or credit enhancement for the tax-exempt bonds.

On this first issue, we note the circuit court failed to address the preliminary question of whether Horizon could file this action when the Lease Agreement provides it shall not institute proceedings to enforce subordinated rent when AMBIT is in default on Senior Debt. Section 7A(g) of the Lease Agreement provides that until all Senior Debt is paid when due, Horizon "shall not, without the prior written consent of the holders of Senior Debt, have any right to demand payment of, or institute any proceedings to enforce, any Subordinated Rent if at such time a default in payment of any Senior Debt when due shall have occurred and be continuing."

---

[4] Although the Lease Agreement was amended a third time on April 1, 1993, that amended lease was nullified in 1996 by agreement of the parties.

### 2. Amount of Rent

Section 6 of the Lease Agreement defines how rent is calculated. Rent owed to Horizon is based upon AMBIT's gross revenue considering the source of its fuel; rent is based on the availability and usability of "local fuel" (e.g., waste coal) on the property. The Lease Agreement provides that if AMBIT burns usable local fuel, the rent is three percent (3%) of the gross revenues. However, when local fuel is not available and AMBIT has to buy "foreign fuel" (e.g., coal from outside sources), the rent is reduced to one percent (1%) of the gross revenues. Further, to the extent AMBIT does not use the local fuel for anything other than an "operating reason," the amount of rent remains at three percent (3%) of the gross revenues.

## C. Agreement to Resolve Pending Litigation

In 1994 and 1996, AMBIT and Horizon had disputes regarding rent payment under the Lease Agreement. The 1994 dispute arose when AMBIT became delinquent on the rent. AMBIT claimed that its rental payments to Horizon were subordinate to payments other than Senior Debt. Horizon sued AMBIT and the matter was resolved by agreement on May 23, 1994. AMBIT paid Horizon for all of the past due rent, plus interest and attorney fees but the issue regarding the priority of the rent payments was not resolved. Subsequently, AMBIT became delinquent on rent due under the Lease Agreement and again took the position that its rent payments were subordinate to payments other than Senior Debt, specifically, operations and maintenance costs. On May 28, 1996, the parties entered into an Agreement to Resolve Pending Litigation that purported to resolve the dispute.

### 1. Priority of Rent

The Agreement to Resolve Pending Litigation addressed the issue of the priority of the rent owed by AMBIT to Horizon as follows:

> Tenant acknowledges and agrees that the payment of Tenant's obligations to Horizon under the Lease . . . has been subordinated under the Lease to the payment of "Senior Debt," as that term is defined in the Lease, on the terms and conditions, and subject to the limitations, contained in the Lease. Horizon has not agreed with Tenant (or, Horizon asserts, with any person or entity), to subordinate any payment of Lease Obligations to any other claims against Tenant, including, without limitation, claims for payment of other operating and maintenance expenses of Tenant or the Plant, which are not included in the definition of "Senior Debt" under the Lease (such other claims against Tenant, including, without limitation, the payment of other operating and maintenance expenses of Tenant or the Plant, which are not included in the definition of "Senior Debt" under the Lease, being hereinafter referred to as "Non-Senior Project Obligations"). Tenant acknowledges that any failure to pay or perform any of the Non-Senior Project Obligations (hereinafter a "Non-Senior Project Obligation Default") neither is intended to nor does constitute an excuse for nonpayment or

4

nonperformance of, or a defense to payment, performance or enforcement of the Lease Obligations. Tenant agrees that it shall not, and it shall instruct its attorneys, accountants, financial advisors, investment bankers and other professionals representing it, that none of them shall assert at any time in any court or other legal proceeding that any prospective, threatened or actual Non-Senior project Obligation Default constitutes or effects an excuse for or a defense to payment or performance of any Lease Obligations.

We note the Agreement to Resolve Pending Litigation was executed after the Trust Indenture and this contract explicitly references the Trust Indenture. Section 2b of the Agreement to Resolve Pending Litigation states:

> Tenant [i.e., AMBIT] is permitted to and shall pay rent which is due and payable under the Lease as "*Other Lease Rent*" under the Trust Indenture or, if Revenues under the Trust Indenture are insufficient to pay Other Lease Rent, then as "*Operating and Maintenance Expenses*" from the "Maintenance Reserve Fund" under the Trust Indenture (so long as funds are available in the Maintenance Reserve Fund). Tenant further acknowledges that all payments of rent due or to become due under the Lease constitute "*Operating and Maintenance Expenses*" under the Trust Indenture.

(Emphasis added). The above provision expressly brings the Trust Indenture's priority of payment into AMBIT's rent obligations to Horizon. However, this provision was not addressed by the circuit court in its summary judgment order.

### 2. Amount of Rent

In order to resolve the dispute over the use of local fuel versus foreign fuel, the parties agreed that Horizon would receive rent in the amount of two and one-half percent (2.5%) of AMBIT's gross revenues so long as *any* local fuel, whether usable or not, remained on the leased premises.[5]

---

[5] Specifically, the contract provides:

> Tenant acknowledges, as a fact, that since the commencement of operations by the Plant, all Foreign Fuel used in the operation of the Plant has been used for Non-Operating Reasons, and further acknowledges, as a fact, that so long as any Local Fuel is located at the Demised Premises, any Foreign Fuel being used in the operation of the Plant is being used for Non-Operating Reasons. As contemplated by the Lease, Local Fuel includes "waste coal material" (as defined in the Lease) on the Demised Premises, whether or not permitted by permits whose issuance or continuance is subject to actions which are within Tenant's control and whether or not reclaimed, and is not dependent on the quality of the waste coal material. Tenant expects and intends that Horizon will detrimentally rely on this factual admission, that such reliance is foreseeable by

5

## II. PROCEDURAL HISTORY

The present dispute again involves the failure of AMBIT to pay Horizon the full rent due under the terms of the Lease Agreement. Horizon and AMBIT agree that rent payments are due and owing. The parties also agree that AMBIT has been in default on its Senior Debt payments since February of 2013, and that AMBIT cannot pay rent under the Lease Agreement while it is in default on Senior Debt.[6] Horizon and AMBIT further agree that the only payments being made by AMBIT from revenues are those to the employees of AMBIT, the banks who financed the project, and the necessary service providers, suppliers, and vendors required to keep the plant operational. The parties disagree about the priority of rent payment with regards to operations and maintenance expenses. AMBIT asserts that it is mandated to pay operations and maintenance even if in default on Senior Debt, in order to keep the plant operational. On the other hand, Horizon argues that rent must be paid before operations and maintenance because rent is subordinated only to Senior Debt.

In February of 2013, AMBIT informed Horizon that due to financial difficulties, it would not be making rent payments until at least September of 2013. Thereafter, Horizon filed a complaint in June of 2013. In Count I, Horizon alleged that, contrary to the terms of the Lease Agreement, AMBIT utilizes a priority list for monthly distributions and payments that subordinates the payment of rent to Horizon to payments other than Senior Debt. Count I of the complaint sought a declaratory judgment as to Horizon's rights in the priority of the payment of rent and interpretation of the applicable terms of the Lease Agreement. Horizon further alleged three counts of breach of contract (Counts II, V, and IX); sought injunctive relief (Count III) and specific performance (Count IV); alleged two counts of fraud and misrepresentation (Counts VI and VII); unjust enrichment (Count VIII); trespass and conversion (Count X); and sought equitable relief (Count XI).

AMBIT filed an answer largely denying the allegations of the complaint. AMBIT counterclaimed that it overpaid rent to Horizon over the past several years by virtue of the fact that the usable local fuel on the property has been exhausted; the Lease Agreement provides for a rental payment of only one percent (1%) of gross revenues (as opposed to the 2.5% of gross revenues AMBIT overpaid) (Count II). AMBIT also alleged that Horizon failed to comply with its reclamation obligations under the Lease Agreement (Count I).

Horizon filed a motion for summary judgment seeking judgment on Count I of its complaint (regarding the priority of rent payments), and on Count II of AMBIT's counterclaim (regarding overpayment of rent). AMBIT filed a response to which Horizon filed a reply. At the October 4, 2013, hearing on the motion, the circuit court determined the issues were questions of

---

Tenant and reasonable on the part of Horizon, and that such reliance is evidenced by Horizon's execution and delivery of this Agreement.

[6] As of September of 2014, AMBIT was in default in the amount of $5.2 million on its payments on the Solid Waste Disposal Revenue Bonds.

law to be decided by the court upon the written contracts between the parties, but that it was prudent to allow limited discovery. Accordingly, the circuit court granted the parties ninety days from the date of the hearing to engage in discovery.

Following this brief discovery timeframe, Horizon filed a renewed motion for summary judgment on Count I of its complaint and on Count II of the counterclaim. AMBIT filed a response, to which Horizon filed a reply. Following a hearing, the circuit court granted Horizon's summary judgment motion on both Count I of the complaint and Count II of AMBIT's counterclaim by order entered March 26, 2014. As for the scope of its ruling, the circuit court concluded the order did not reach the following: Count I of AMBIT's counterclaim (asserting an environmental liability claim against Horizon) and Counts X and XI of Horizon's complaint (seeking damages for AMBIT locating fly ash on the leased property and equitable relief in the form of the removal of the same).[7]

## III. STANDARD OF REVIEW

Our review in this case is unquestionably plenary as we are examining the grounds upon which the circuit court relied in granting summary judgment to Horizon. *See* Syl. Pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994) ("A circuit court's entry of summary judgment is reviewed *de novo.*"). As we articulated in syllabus point three of *Painter,* "[t]he circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial." *Id*. at 190, 451 S.E.2d at 756. Summary judgment is not favored, and on appeal to this Court, we view the facts in the light most favorable to AMBIT. *See Masinter v. WEBCO Co.,* 164 W.Va. 241, 242, 262 S.E.2d 433, 435 (1980) ("we have viewed summary judgment with suspicion and have evolved the rule that, on appeal, the facts must be construed in a light most favorable to the losing party"). With these principles in mind, we consider the arguments of the parties.

## IV. DISCUSSION

On appeal, AMBIT raises two substantive assignments of error. AMBIT argues: (1) the circuit court failed to recognize the meaningful contractual ambiguities between Horizon, AMBIT, and the financial institutions who hold Senior Debt and this failure has resulted in a summary disposition that misstates the financial obligations of AMBIT to Horizon with regard to the priority of rent; and (2) the circuit court failed to allow sufficient time for discovery on the local fuel versus foreign fuel issue, refused to consider the extrinsic evidence that was developed in discovery on the subject, and failed to address or resolve the ambiguities in the contracts.

---

[7] The circuit court also stated Horizon advised that Count III (requesting injunctive relief) and Count IV (seeking specific performance) were rendered moot. The circuit court, sua sponte, dismissed, without prejudice, Counts V through VIII of Horizon's complaint because the issues appear to be resolved by the terms of the March 26, 2014, order.

Horizon disagrees and counters that: (1) the Lease Agreement and the Agreement to Resolve Pending Litigation subordinate rent solely to Senior Debt and not maintenance and operational costs; and (2) AMBIT's obligation to pay rent was unambiguously modified by the Agreement to Resolve Pending Litigation.

With regard to the first issue, the decades-long relationship between AMBIT and Horizon is governed by a Lease Agreement that has been revised and amended several times, by financial documents setting forth AMBIT's obligations to pay Senior Debt including the Trust Indenture, and by the Agreement to Resolve Pending Litigation. These documents are voluminous and multifaceted. We summarily reject Horizon's argument that the Trust Indenture is "indisputably extrinsic to the contracts between the parties" because Section 2b of the Agreement to Resolve Pending Litigation expressly brings the Trust Indenture's priority of payment into AMBIT's rent obligations. However, this contractual provision was not acknowledged in the circuit court's summary judgment order. Therefore, we find there are meaningful contractual ambiguities with regard to the priority of rent. Under the terms of the Lease Agreement, AMBIT's obligation to pay rent to Horizon is subordinate *only* to Senior Debt. However, when we consider the Agreement to Resolve Pending Litigation, rent is due and payable as "Other Lease Rent." This would arguably place rent under the seventh payment group in the Trust Indenture – still subordinate to groups three through six constituting Senior Debt, but *below* maintenance and operational costs.[8] The wording of these contracts supports more than one plausible alternative interpretation; they are ambiguous.

With regard to the second issue, Horizon relies upon the Agreement to Resolve Pending Litigation to remove "usable" local fuel from the rent calculation altogether. However, this contract resolved a dispute between AMBIT and Horizon at the time it was executed and AMBIT maintains it has no prospective application, with limited exceptions not applicable here. Nevertheless, this contract is ambiguous on its face because by its express terms, it "does not supersede the Lease." And the terms of the Lease provide that rent is calculated based on whether *usable* local fuel is on the premises. Significantly, AMBIT's Plant Manager executed an affidavit stating all usable local fuel was exhausted in 2003. Accordingly, we find factual issues remain including whether the parties intended for the terms of the Agreement to Resolve Pending Litigation to operate prospectively and, if not, whether usable local fuel remains on the premises.

Viewing the evidence in the summary judgment appendix record in the light most favorable to AMBIT, this Court finds the contracts are ambiguous on both disputes on appeal. Determining the issues of priority of rent and whether AMBIT overpaid rent requires fact-finding. "Where a contract is ambiguous then issues of fact arise and a summary judgment is ordinarily not proper." Syl. Pt. 2, *Lee Enters., Inc. v. Twentieth Century-Fox Film Corp.*, 172 W.Va. 63, 303 S.E.2d 702 (1983). *See generally Wolter v. Equitable Res. Energy Co., W. Region,* 979 P.2d 948, 951 (Wyo. 1999) ("In cases requiring the interpretation of a contract, a

---

[8] In its brief before this Court, Horizon states that AMBIT essentially agreed that rent payments "were on par with operating and maintenance expenses." If that were the case, rent would fall under the Trust Indenture's second payment group, *before* the payment groups three through six constituting Senior Debt. Arguably, this regrouping would violate the terms of the Lease Agreement.

summary judgment is appropriate only if the contract is clear and unambiguous."); *Loyola Acad. v. S & S Roof Maint., Inc.*, 586 N.E.2d 1211, 1215 (Ill. 1992) ("In cases involving contracts, there is a disputed fact precluding summary judgment when the material writing contains an ambiguity which requires admission of extrinsic evidence.").

Accordingly, we hold that summary judgment was not an appropriate method to dispose of the two claims at issue because significant factual issues exist. We therefore do not attempt to resolve their merits. As we cautioned in *Masinter*, "[i]n complex cases, the tendency on a summary judgment motion is to rely on the facts developed through discovery as constituting all of the relevant facts in the case. This may lead to inaccurate factual assessment." 164 W.Va. at 243, 262 S.E.2d at 436. Although it filed no formal motion below,[9] AMBIT contends this case would be appropriate for referral to the Business Court Division for further proceedings. For the reasons set forth above, we agree.

## V. CONCLUSION

The order of the circuit court is reversed, and this action is remanded for further proceedings. Given the complexity of the contractual agreements governing this dispute, we direct the circuit court to promptly transfer this case, in its entirety, to the Business Court Division for further proceedings consistent with this decision.

The Clerk is hereby directed to issue the mandate forthwith.

Reversed and remanded.

**ISSUED:** May 13, 2015

**CONCURRED IN BY:**

Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Menis E. Ketchum
Justice Allen H. Loughry II

---

[9] West Virginia Trial Court Rule 29.06 provides, in part, that "[a]ny party or judge may seek a referral of Business Litigation to the Division by filing a Motion to Refer to the Business Court Division with the Clerk of the Supreme Court of Appeals of West Virginia."